**COX MEDIA GROUP, LLC, Appellant**

v.

**Dr. Joel JOSELEVITZ, Appellee**

NO. 14–16–00333–CV

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed March 21, 2017.

Panel consists of Chief Justice Frost and Justices Brown and Jewell.

## OPINION

Kevin Jewell, Justice

After a newspaper published an article in which he was featured, Dr. Joel Joselevitz sued Cox Media Group, LLC, the newspaper's ultimate parent company, for defamation. Cox Media filed a motion to dismiss under the Texas Citizens Participation Act ("TCPA"),[1] and the trial court timely conducted a hearing on the motion.[2] The trial court failed to rule on the motion, resulting in its denial by operation of law.[3] Cox Media filed this interlocutory appeal challenging the denial of the motion to dismiss and asserting a claim for attorney's fees and other costs and expenses. Because we conclude that Cox Media's motion should have been granted and that the trial court should determine attorney's fees and other costs, we reverse and remand for proceedings consistent with this opinion.

## Background

Appellee Dr. Joel Joselevitz was a pain management doctor. In an August 2014 agreed order, the Texas Medical Board (the "Board") curtailed Joselevitz's ability to prescribe medications and permanently prohibited him from treating patients for chronic pain.

According to Board records, Joselevitz was first disciplined in August 2011, after one of his patients died from a prescription drug overdose. Board staff charged Joselevitz with "non-therapeutically and negligently" prescribing "a dangerous combination of narcotics, which included hydrocodone, hydromorphone, loratapine,

James A. Hemphill for Cox Media Group, LLC.

Howard L. Steele, Shreedhar Patel, for Dr. Joel Joselevitz.

Daniel D Horowitz III, for Carol Roane.

1. *See* Tex. Civ. Prac. & Rem. Code §§ 27.001–.011.

2. *See id.* § 27.004(a).

3. *See id.* § 27.008(a).

soma and diazepam, to this patient that resulted in her death." The Board found that Joselevitz's patient died in 2010 from "respiratory failure due to overdose of the medications prescribed by [Joselevitz] and possible alcohol consumption." Joselevitz agreed to enroll in and complete sixteen hours of continuing medical education and was assessed a $2,000 fine.

The Board filed another complaint against Joselevitz in February 2014. The complaint described Joselevitz's treatment of two patients who died while under his care. In the complaint, the Board documented numerous alleged prescribing violations for each patient. As to the first patient, the Board asserted that Joselevitz treated her from February 2011 until February 2012, when she died "from the toxic effects of clonazepam (i.e., Klonopin), alprazolam (i.e., Xanax), diazepam, hydromorphone (i.e., Dilaudid), oxycodone, and promethazine (i.e., Phenergan)." According to the Board, Joselevitz prescribed three of these medications—Dilaudid, Klonopin, and Phenergan—over the course of his treatment. The Board further asserted that: (1) Joselevitz had been advised that this patient was receiving Xanax and other medications from other sources; (2) Joselevitz's treatment was not supported by the records; (3) Joselevitz failed to document his treatment rationale; (4) urine drug screenings indicated that this patient was taking medications that Joselevitz had not prescribed; and (5) Joselevitz failed to address the patient's aberrant drug-taking behaviors/risk factors. The Board asserted that this patient's drug overdose was "attributed to some of the medications prescribed" by Joselevitz.

Joselevitz treated the second patient mentioned in the February 2014 complaint from January 2006 to January 2011. According to the Board, over this five-year period, Joselevitz repeatedly prescribed the patient Norco, Soma, and Xanax (among other medications), without a documented treatment rationale or any record support. The Board noted that this patient was admitted to an emergency room in February 2008, after falling; the medical records from the visit indicated that the patient had signs of a medication overdose. Joselevitz addressed neither the patient's hospitalization nor her overdose during the patient's follow-up visit in May 2008. The Board charged that this patient's pain reports frequently were inconsistent and that "aberrant drug-taking behaviors/risk factors were not addressed." According to the complaint, Joselevitz last saw this patient on January 5, 2011, when he prescribed Norco, Xanax, Soma, and morphine sulfate. She died only three days later "from the combined toxic effects of morphine, hydrocodone (i.e., Norco), alprazolam (i.e., Xanax), and carisprodol (i.e., Soma)." The Board stated that Joselevitz "had prescribed this drug combination to the patient."

Ultimately, the Board and Joselevitz settled the February 2014 complaint by entering into the August 2014 agreed order, mentioned above, which curtailed Joselevitz's prescribing privileges and permanently prohibited him from treating chronic-pain patients. In the August 2014 agreed order, the Board found that:

- Board staff conducted an audit of [Joselevitz]'s Houston clinic for the period of August 1, 2013, through August 30, 2013. During this 30-day time period audited, 449 patients were seen, and 98.2% of these patients were given prescriptions for a controlled substance (an opioid, carisoprodol, benzodiazepine, or barbiturate) to treat a pain condition.

- [Joselevitz] obtained inadequate histories, performed insufficient physical examinations, and failed to meet the standard of care for these patients.

- [Joselevitz] non-therapeutically pre-scribed controlled substances and continued to prescribe controlled sub-stances as long-term treatment and without adequately documenting and justifying changes in mediation and/or indications of therapeutic ben-efits.
- [Joselevitz] failed to properly monitor these patients for aberrant drug-tak-ing behavior and/or failed to properly respond to indications of aberrant drug use.
- [Joselevitz]'s medical records for these chronic pain patients were inadequate.
 . . .
- The panel that restricted [Joselevitz]'s license, while finding multiple viola-tions of the [Medical Practice] Act, did not find [Joselevitz] to be operating a pill mill.

Neither of the patients described in the February 2014 Board complaint are men-tioned in the August 2014 agreed order, although the complaint is part of the Board's public records.

During this time period, and separate from Board proceedings, Joselevitz was twice sued for wrongful death. First, the family of Joanne Tilley sued Joselevitz in March 2012.[4] In the petition, the Tilley family alleged that Joselevitz "prescribed a series of unnecessary and dangerous pain medications to [Tilley] without any medical evaluation as to the cause of her pain." The family alleged that Joselevitz's care fell below the standard of care because he failed to adequately monitor, evaluate, and treat Tilley. The family claimed Joselevitz prescribed "unnecessary and dangerous prescription drugs."

Carol Roane, the mother of Joselevitz's patient Nicole Willens, also sued Joselevitz

for wrongful death.[5] Roane alleged that from February 2011 through February 2012, Joselevitz "prescribed a series of un-necessary and dangerous prescription pain medications" to Willens, "without any med-ical evaluation . . . or any regard for the warning signs for drug abuse" that Willens displayed. Among the warning signs were notes in Willens's medical records—dating to Joselevitz's initial treatment—indicating that Willens "had a known/suspected opi-ate dependency" and was "manipulative, attempting to direct care and requesting Dilaudid (a narcotic pain medication)." Roane asserted that the prescribed medi-cations included morphine, Dilaudid, and Fentanyl. According to the suit, Joselevitz ignored warning signs of Willens's "aber-rant or addictive behavior," which was evi-dent in her questionnaire responses and in blood and urine test results. Roane assert-ed that Willens ultimately "died from the toxic effects of these medications," and that her death "was a direct and proximate cause" of Joselevitz's negligence, which in-cluded "failing to adequately monitor, eval-uate, and treat Nicole Willens by prescrib-ing unnecessary and dangerous drugs."

In late December 2014, the *Austin American–Statesman* newspaper publish-ed a lengthy article—both online and in its print edition—titled, "Texas doctors rarely charged in prescription drug epidemic." The article featured Joselevitz prominent-ly. This article opens as follows:

Many Texas doctors who violate pre-scription drug laws have little to fear from prosecutors, even when their pa-tients die of an overdose.

Despite a 2010 law to crack down on illegal prescribing, criminal charges were filed against fewer than a third of

4. The newspaper article over which Joselevitz sued Cox Media identifies Tilley as the patient described in the August 2011 Board order.

5. The newspaper article identifies Willens as "Patient 1" from the February 2014 Board complaint, discussed above.

the 83 doctors punished by the Texas Medical Board in the past three years for drug law violations involving two or more patients, an *American–Statesman* investigation has found.

Some doctors with a history of prescribing violations ultimately give up their license to avoid further scrutiny and freely move on or retire. Still others remain in practice.

Take, for example, Dr. Joel Joselevitz of Houston, who had three patients die of an overdose between 2010 and 2012, according to the medical board.

The article discusses Board proceedings involving Joselevitz, and two other doctors, including disciplinary orders and a Board complaint filed against Joselevitz. For example, the article highlights some of the Board's findings, including that Joselevitz "failed to adequately justify a medical need for the drugs, failed to follow standards of care[,] and failed to monitor patients for drug abuse." The article notes that the Board "forbade Joselevitz to treat patients for chronic pain or prescribe controlled substances."

Family members of Joselevitz's former patients also provided input for the article: "The *Statesman* reached two of the three families who lost loved ones to overdoses. They said they were stunned that Joselevitz did not lose his license—or worse." The article quotes Carol Roane as opining that Joselevitz "slowly killed" Willens "with his prescription pad." According to the article, Roane described the Board's actions in restricting Joselevitz's medical license as a "pinkie slap." The article also quoted Mark Tilley, whose wife, Joanne, died of a prescription drug overdose while under Joselevitz's care, as stating, "The only difference between this guy [Joselevitz] and a dealer on the street is, he's got a license, and he's protected by insurance."

The article then shifts focus to generally perceived problems with criminal prosecution of physicians. Joselevitz is not mentioned in the next several sections, which discuss two other pain doctors who came under Board scrutiny, problems with "pill mills," and a "simple fix" to the problem of "doctor shopping." But the article circles back to Joselevitz later in a section entitled, "Too late for Nikki." This section begins:

In June 2011, Joselevitz ranked No. 1 in Texas for his prescribing of hydrocodone to Medicare patients, according to Prescriber Checkup by ProPublica, a nonprofit investigative news site. Those patients received an average of 23 prescriptions, compared with an average of 10 by his peers. Also, 97 percent of his patients filled at least one prescription for a narcotic painkiller, compared with 82 percent of his peers' patients, the site says.

After discussing Joselevitz's treatment of Joanne Tilley and the Board's actions, the article quotes from the Board's complaint against Joselevitz regarding his care of Nicole Willens:

The board alleged in a complaint in February that despite Joselevitz's testing that showed Willens (identified as Patient 1) to be at "high risk of using controlled substances aberrantly" and tests that showed she used drugs he did not prescribe, his treatment "did not include any strategies to curb that risk."

"Patient 1 was repeatedly prescribed opioids without reliable and/or clinically meaningful indication and/or evidence of a therapeutic benefit," the complaint says.

Willens was 25 when she overdosed.

The article notes that Joselevitz sued the *American–Statesman* and Roane after the newspaper emailed him requesting an interview, but that the newspaper was then dropped from the suit.

The article closes by explaining the newspaper's methodology in conducting its investigation. In the final section, the article clarifies that federal and state law forbid "non-therapeutic prescribing," which is described as prescribing drugs for a non-medical purpose. The article observes that most "drug violations lead to administrative actions against a doctor's medical license by the Texas Medical Board," and that some doctors are ordered to surrender their prescribing certificates to the United States Drug Enforcement Agency and the Texas Department of Public Safety. The article mentions two "rare instances" when doctors have been convicted for patient deaths: Dr. Conrad Murray, who was convicted in California of involuntary manslaughter for Michael Jackson's death, and Dr. Stan Xuhui Li, who was convicted in New York of manslaughter for the over-dose deaths of two patients.

As noted in the article, Joselevitz sued Cox Media, the ultimate parent company of the *Austin American–Statesman*, and Carol Roane, the mother of Joselevitz's former patient Nicole Willens. Joselevitz initially sought injunctive relief to prevent the publication of the article, based in large part on his asserted confidential settlement agreement with Roane regarding Willens's death. After Cox Media filed a motion to dismiss under the Texas Citizens Participation Act, Joselevitz non-suited his claims against Cox Media without prejudice. The *American–Statesman* published the article, and Joselevitz amended his petition to re-join Cox Media to the suit; this time, Joselevitz alleged, as is relevant here, that Cox Media defamed him.

Cox Media filed a second motion to dismiss under the TCPA. In this motion, Cox Media asserted that the TCPA applied to Joselevitz's claim because he sued over publication of a newspaper article that addressed a matter of public concern, i.e., "matters of public health, community well-

being, and governmental functions." Cox Media urged that, because it established that the TCPA applied, Joselevitz was required to present clear and specific evidence of each essential element of his defamation claim. Cox Media further argued that the article's statements about Joselevitz were "true and accurate recounts of regulatory action and of publicly filed litigation," and that "[f]alsity is an essential element of Joselevitz's defamation claim." Accordingly, Cox Media urged dismissal under the TCPA for two independent, but related, reasons. First, Joselevitz could not meet his prima facie burden to offer clear and specific evidence of falsity, which is a required element of his claim. Second, the challenged statements were privileged under Texas Civil Practice and Remedies Code Chapter 73 and common law. Finally, Cox Media sought reasonable attorney's fees, costs, and sanctions against Joselevitz under the TCPA.

In his response to Cox Media's motion, Joselevitz urged that Cox Media failed to offer any evidence that the TCPA applied. He also asserted that Cox Media defamed him because, according to Joselevitz, the article falsely: (1) reported that Joselevitz "caused" Nicole Willens's overdose, when the Board complaint stated that Willens's drug overdose "can be attributed to some of the medications" prescribed by Joselevitz; (2) created a perception that Joselevitz operated a "pill mill," when the Board expressly found that Joselevitz was not operating a pill mill; and (3) stated that Roane sued Joselevitz because he "made" Willens an addict, when Roane's lawsuit did not include any facts that would support that inference.

Joselevitz attached an affidavit to his response. In it, he stated that the article incorrectly attributed sole fault to him for Willens's death even though he was not the only doctor who prescribed the "cock-

tail of medications" on which she overdosed. According to Joselevitz's affidavit, the article was misleading because it insinuated that he "might be categorized as a pill mill doctor, which is false." Joselevitz additionally referenced the article's statement that he was the "number 1 prescriber of hydrocodone, but hydrocodone was not found in Nikki Willens'[s] system," and he did not prescribe hydrocodone to her. He contended that, by failing to report that he did not prescribe hydrocodone to Willens or that she did not have hydrocodone in her system when she died, the article painted him in a "false light." Joselevitz stated that the article "states as fact" that Roane sued him because he "overloaded Willens with prescriptions until she became addicted," but that he did not "overload" her with prescriptions or cause her addiction. Finally, Joselevitz averred that the article described a Board disciplinary order as portraying his prescribing of potentially addictive pain drugs during a specified 30-day period as "far above his peers' average," although the Board order did not discuss any peer average or whether his prescription rate of these medications was high.

The trial court heard the motion to dismiss on March 4, 2016. After hearing the argument of counsel, the trial court took the matter under advisement. However, the court did not rule on the motion,[6] and it was denied by operation of law.[7] This appeal timely followed.[8]

---

6. *See* Tex. Civ. Prac. & Rem. Code § 27.005(a) (trial court must rule on motion to dismiss "not later than the 30th day following the date of the hearing on the motion").

7. *See id.* § 27.008(a) (stating that if trial court does not rule on motion in time prescribed by section 27.005, the motion is considered denied by operation of law and the moving party may appeal).

## Analysis

Cox Media challenges the denial of its motion to dismiss in several issues. The dispositive issues concern whether: (1) Cox Media established that the TCPA applies to Joselevitz's defamation claim; (2) Joselevitz met his prima facie burden to prove falsity or, alternatively, whether Cox Media showed that the statements at issue are otherwise privileged; and (3) Cox Media is entitled to an award of attorney's fees, costs, and sanctions.[9] We begin with a brief overview of the TCPA, then discuss the applicable standards of review, and finally turn to an analysis of each of Cox Media's dispositive issues.

### A. Overview

■ This appeal involves the application of the TCPA, which is codified in Chapter 27 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code §§ 27.001–.011. The TCPA is an anti-SLAPP law; "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation." *Fawcett v. Grosu*, 498 S.W.3d 650, 654 (Tex. App.–Houston [14th Dist.] 2016, pet. filed) (op. on reh'g) (citing *Jardin v. Marklund*, 431 S.W.3d 765, 769 (Tex. App.–Houston [14th Dist.] 2014, no pet.)). The TCPA is intended "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, to protect the rights of a person to file meritorious law-

---

8. *See id.* §§ 27.008(a); 51.014(a)(12) (authorizing interlocutory appeal of denial of Chapter 27 motion to dismiss).

9. Cox Media presents other issues for our review, but our resolution of these issues is dispositive of this appeal *See* Tex. R. App. P. 47.1.

suits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002.

■ To further this end, the TCPA establishes a mechanism for prompt dismissal of lawsuits that threaten the rights of free speech, to petition, or of association. *Fawcett*, 498 S.W.3d at 655 (citing *Rehak Creative Servs. Inc. v. Witt*, 404 S.W.3d 716, 719 (Tex. App.–Houston [14th Dist.] 2013, pet. denied), *disapproved of on other grounds by In re Lipsky*, 460 S.W.3d 579, 587–88 (Tex. 2015)). The TCPA should be "construed liberally to effectuate its purpose and intent fully." *Rehak Creative Servs.*, 404 S.W.3d at 719 (citing Tex. Civ. Prac. & Rem. Code § 27.011(a)).

## B. Standards of Review

■ We review the trial court's denial of Cox Media's motion to dismiss de novo. *Id.* at 725. Under the de novo standard, we "make an independent determination and apply the same standard used by the trial court in the first instance." *Fawcett*, 498 S.W.3d at 656 (quoting *Rehak Creative Servs.*, 404 S.W.3d at 725). In applying this standard, our first step is to determine whether Cox Media has shown, by a preponderance of the evidence, that Joselevitz's legal action is "based on, relates to, or is response to" Cox Media's exercise of the right of free speech. *See Lipsky*, 460 S.W.3d at 586. If Cox Media demonstrates that Joselevitz's claim implicates this right, "the second step shifts the burden to [Joselevitz] to 'establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim in question.'" *See id.* at 587 (quoting Tex. Civ. Prac. & Rem. Code § 27.005(c)). But, even if Joselevitz satisfies the second step, the

court will dismiss the action if Cox Media "'establishes by a preponderance of the evidence each essential element of a valid defense' to the plaintiff's claim." *Exxon-Mobil Pipeline Co. v. Coleman*, No. 15-0407, 512 S.W.3d 895, 899, 2017 WL 727274, at *2 (Tex. Feb. 24, 2017) (per curiam) (quoting Tex. Civ. Prac. & Rem. Code § 27.005(d)).

■ Further, the TCPA requires the trial court to award the successful movant court costs, "reasonable attorney's fees," and other expenses as "justice and equity may require,"[10] as well as any appropriate sanctions as the court determines sufficient to deter future similar claims. Tex. Civ. Prac. & Rem. Code § 27.009(a)(1). A "reasonable" attorney's fee is "one that is not excessive or extreme, but rather moderate or fair." *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). The determination of a reasonable attorney's fee generally "rests within the court's sound discretion." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016).

With these standards in mind, we turn to the dispositive issues in this appeal.

## C. The TCPA's Application to Joselevitz's Defamation Claim

■ In its first issue, Cox Media asserts that it established that the TCPA applies to Joselevitz's defamation claim. As noted above, Cox Media was first required to prove by a preponderance of the evidence that Joselevitz's legal action is based on, relates to, or is in response to Cox Media's exercise of the right of free speech.[11] According to Chapter 27, an "'[e]xercise of the right of free speech' means a communi-

10. In *Sullivan v. Abraham*, 488 S.W.3d 294, 297–99 (Tex. 2016), the Supreme Court of Texas determined that the "Legislature intended to limit the justice-and-equity modifier to other expenses"; it does not apply to the determination of "reasonable attorney's fees."

11. In determining whether the plaintiff's claim should be dismissed, we, like the trial court, must consider the pleadings and any supporting or opposing affidavits. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a).

cation made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3). Joselevitz does not contest that Cox Media, through the *Austin American–Statesman* "communicated" the article or that it was exercising its free speech rights in doing so; instead, Joselevitz urges that Cox Media failed to establish that the article involves a "matter of public concern."

The article related, in large part if not entirely, to the provision of medical services by health care professionals. For example, the article details various Board actions and allegations, as well as allegations in two wrongful-death lawsuits filed against Joselevitz, regarding his provision of medical services to several of his patients. Joselevitz asserted in his amended petition that the article "discusses overprescribing doctors and [Joselevitz] specifically as being a doctor that oversprescribed" and "lay[s] sole blame on [Joselevitz] for the death of his patients." The "provision of medical services by a health care professional constitutes a matter of public concern." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 510 (Tex. 2015) (citing *Neely v. Wilson*, 418 S.W.3d 52, 70 n.12 & n.26 (Tex. 2013) and Tex. Civ. Prac. & Rem. Code § 27.001(7)). Thus, we conclude that the article communicated matters of public concern. Accordingly, because Joselevitz's suit was based on, related to, or was in response to Cox Media's exercise of free speech rights, the TCPA applies.

We sustain Cox Media's first issue.

## D. Joselevitz's Failure to Establish Prima Facie Case

In its second issue, Cox Media urges that the article was a substantially true account of Board proceedings and the lawsuits filed by the Willens and Tilley families. According to Cox Media, Joselevitz cannot meet his prima facie burden as a matter of law because the challenged statements are substantially true. *See KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 713–14 (Tex. 2016). Separately, Cox Media also contends that the article's substantial truth, together with other elements, establish that the article is privileged under Chapter 73 and common law.[12] We first address whether Joselevitz met his prima facie burden. If we conclude that Joselevitz failed to present clear and specific evidence that each of the challenged statements was not substantially true, then we need not reach Cox Media's alternative argument that the article is privileged. *See KBMT Operating Co.*, 492 S.W.3d at 713–15.

■■■■ Because Cox Media established that Joselevitz's claim is covered by Chapter 27, the burden shifted to Joselevitz to show "by clear and specific evidence a prima facie case for each essential element of the claim in question." Tex. Civ. Prac. & Rem. Code § 27.005(c). A prima facie case means "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 591. The parties agree that when, as here, a private figure sues a media defendant over statements on matters of public concern, the plaintiff must prove: (1) the publication of a false state-

---

12. Section 73.002 of the Texas Civil Practice and Remedies Code provides that publication in a newspaper or periodical is privileged and not grounds for a libel action if it is "a fair, true, and impartial account of ... a judicial proceeding [or] an official proceeding ... to administer the law." Tex. Civ. Prac. & Rem. Code § 73.002(a), (b)(1). Additionally, such a privilege is recognized at common law. *See Goss v. Houston Comm. Newspapers*, 252 S.W.3d 652, 655 (Tex. App.–Houston [14th Dist.] 2008, no pet.) (citing Restatement (Second) of Torts § 611).

ment of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault; and (4) damages, in some cases. *Id.* at 593; *see KBMT Operating Co.*, 492 S.W.3d at 713. "In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *Lipsky*, 460 S.W.3d at 591.

 The critical element at issue here is falsity. Because Cox Media is undisputedly a media defendant—and we already have determined that the article communicated matters of public concern— Joselevitz bore the burden of establishing by clear and specific evidence a prima facie case that the *American–Statesman* article was false—an essential element of his defamation claim. *See KBMT Operating Co.*, 492 S.W.3d at 713; *Lipsky*, 460 S.W.3d at 591; *see also D Magazine Partners, L.P. d/b/a D Magazine v. Rosenthal*, No. 15–0790, slip op. at 6–7, —— S.W.3d ——, 2017 WL 1041234 (Tex. Mar. 17, 2017), *available at* http://www.txcourts.gov/media/1437551/150790.pdf. "A statement need not be perfectly true; as long as it is substan-

tially true, it is not false." *KBMT Operating Co.*, 492 S.W.3d at 714. Substantial truth may be measured by whether the article, taken as a whole, is more damaging to Joselevitz's reputation than a truthful report would have been. *See id.* In making this determination, we do not compare the gist[13] of the article to the actual facts; instead, we must determine whether the article is a "fair, true, and impartial account of the proceedings" reported. *See id.* at 715. Whether a publication is not substantially true depends on a "reasonable person's perception of the entirety of a publication and not merely on individual statements." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).

On appeal, Joselevitz bases his defamation claim on the following statements he attributes to the *American–Statesman* article: (1) a caption to a photograph that implies that Willens died of an overdose of drugs prescribed solely by Joslevitz; (2) the article implies that Joselevitz operated a "pill mill"; (3) the article falsely reports that Roane "sued Joselevitz and complained that he overloaded Willens with prescriptions until she became addicted"; and (4) the article, rather than simply reporting the news, "stood to paint Dr. Joselevitz (and others) as vitriolic doctors who harmed their patients."[14]

---

13. The "gist" of an article is its "substance or essence." *Gist*, NEW OXFORD AMERICAN DICTIONARY 735 (Angus Stevenson & Christine Lindberg eds., 3d ed. 2010); *see also Gist*, BLACK'S LAW DICTIONARY 805 (10th ed. 2014); *KBMT Operating Co.*, 492 S.W.3d at 714 (explaining that the import of a broadcast as a whole to the ordinary listener is the "gist" of the broadcast).

14. These are the only statements or implications from the article that Joselevitz discussed in his response to Cox Media's motion to dismiss. In his affidavit, Joselevitz mentioned other alleged inaccuracies, but he did not argue that these statements were defamatory in his response to the motion. These alleged inaccuracies included (1) a statement in the article that Joselevitz's prescribing rate of po-

tentially addictive pain drugs was "far above his peers' average"; and (2) the article's "insinuation" that he prescribed hydrocodone to Willens. Joselevitz bore the burden of establishing that these alleged inaccuracies were not substantially true, but he omitted discussion of them from his response to Cox Media's motion to dismiss. Joselevitz referred to these statements only in his sur-reply to Cox Meida's motion to dismiss—filed a week after the hearing on the motion—to further his argument that the overall gist of the article was defamatory. Assuming he properly preserved these arguments below, these asserted inaccuracies are no more than minor details that do not affect the overall non-defamatory gist of the article. *See Klentzman v. Brady*, 312 S.W.3d 886, 899 (Tex. App.–Houston [1st Dist.] 2009, no pet.) (citing *Masson v. New*

■ **Statements about Willens.** First, as to the photograph caption, it reads, "Carol Roane has a shrine in her Laguna Niguel, Calif. home dedicated to her daughter, Nikki Willens, who overdosed on drugs prescribed to her in Texas by a doctor disciplined for his prescribing practices." Joselevitz complained that this statement creates a false impression that Joselevitz "caused" Willens's overdose. He points to the Board complaint, which alleges that Willens's overdose "can be attributed to some of the medications prescribed by" Joselevitz; he asserts that the article misleadingly omitted the word "some" from its report.

Joselevitz ignores that, although the Board complaint attributed Willens's overdose to *some* of the drugs prescribed by him, it also contained allegations that a second patient died from an overdose of a specific drug combination that Joselevitz had prescribed.[15] Further, in Roane's wrongful death suit against Joselevitz, Roane alleged that Willens died from the toxic effects of medications prescribed by Joselevitz and other medications that Joselevitz was aware Willens was taking "which were potentially dangerous in combination" with medications he prescribed. The Board complaint also alleged that Willens's drug test results while under Joselevitz's care, as well as her medical records, reflected that she was taking other medications he had not prescribed to her, as well as drinking alcohol.

The essence of Joselevitz's point is that the caption implies that Joselevitz was the sole cause of Willens's overdose because it omits the word "some" from the sentence. When compared to Board proceedings and the lawsuits, however, we conclude that the article's report of the proceedings does not paint Joselevitz in a worse light than the proceedings themselves—i.e., that Willens died by overdosing on a cocktail of some of the medications that Joselevitz prescribed to her and other medications that Joselevitz was or should have been aware Willens was taking. *See KBMT Operating Co.*, 492 S.W.3d at 714; *see also Avery v. Baddour*, No. 04-16-00184-CV, 2016 WL 4208115, at *6 (Tex. App.–San Antonio Aug. 10, 2016, pet. denied) (mem. op.) ("Even if the captions incorrectly identified Avery as a secessionist, falsely implied Avery renounced his U.S. citizenship, incorrectly identified the Texians as secessionists, and falsely implied Avery was a member of a secessionist organization, the gist of the article is substantially true: the Republic of Texas is a volunteer, non-violent organization premised on the belief that Texas is a sovereign nation and whose goal is to legally extricate itself from the United States.").

Joselevitz also challenges another statement about Willens. He argues that the article falsely reports Roane's wrongful death lawsuit as alleging that he "overloaded" Willens with prescriptions until Willens became addicted. He contends that Roane's petition "actually states that Willens was a known drug addict prior to her patient relationship with Joselevitz." Joselevitz overstates Roane's allegations. Roane alleged in her petition that Willens's medical records indicated she had a "known/suspected opiate dependency." The petition also stated that, when Willens was discharged from St. Luke's Hospital—where Joselevitz had consulted for pain

*Yorker Magazine, Inc.*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex. 1990)).

15. Joselevitz stated in his affidavit that Willens's autopsy showed that "multiple medi-

cations" caused her death. But, in measuring the substantial truth of a report on proceedings, we compare the gist of the allegedly defamatory report "to a truthful report of the official proceedings, not to the actual facts." *KBMT Operating Co.*, 492 S.W.3d at 714.

management and prescribed various narcotic pain medications to Willens—her "discharge diagnoses included pain medication dependence." Thus, Roane's petition stated that Willens had a known or *suspected* opiate dependency, and that, *after* she was treated by Joselevitz, she was discharged with a pain medication dependence. There was no statement in the petition that Willens was a "known drug addict" *before* Joselevitz treated her.

■ Further, as detailed above, both Roane's petition and the Board complaint contain allegations that Joselevitz ignored signs of Willens's dependency on narcotic pain medications and contributed to her dependency. In fact, the article quotes Roane as stating that, in her opinion, Joselevitz "slowly killed [Willens] with his prescription pad."[16] And whether Joselevitz "overloaded" Willens until she became an addict is in no way the focus of the article. At most, any inaccuracy is a minor detail in the article. The Board found that Joselevitz "non-therapeutically prescribed controlled substances" and ignored signs of "aberrant drug-taking behavior" in his patients, three of whom died of prescription drug overdoses while under his care. We conclude the statement about which Joselevitz complains does not paint him in a worse light than the proceedings themselves. *See KBMT Operating Co.*, 492 S.W.3d at 714.

Thus, we conclude that the statements in the article about Willens's death and drug dependency are substantially true.

■ *Alleged "pill mill" implication.* Next, Joselevitz urged that the article "juxtaposes paragraphs that would lead an ordinary reader to conclude that Joselevitz operated a 'pill mill,'" when the Board expressly stated in its disciplinary order that it "did not find" Joselevitz operated a pill mill.

The article includes a section that discusses Texas's "pill mill" law, but Joselevitz is not mentioned in this part of the article. The article never defines the term "pill mill," and instead focuses on the State's enforcement efforts concerning this law. Joselevitz's name is not contained in the twelve paragraphs in the section of the article discussing Texas's pill mill law. Joselevitz is not mentioned in the following two sections of the article, which consist of sixteen paragraphs. In fact, in the section immediately following the pill mill discussion, the article discusses a different doctor who was disciplined by the Board, rather than Joselevitz.

When read objectively, the article neither implies nor states that Joselevitz operated a pill mill. Simply put, reasonable readers would not infer from this article that Joselevitz operated a pill mill. *Cf. KBMT Operating Co.*, 492 S.W.3d at 715–16; *see also Avery*, 2016 WL 4208115, at *6. The discussion of the pill-mill legislation is a topic distinct from the discussion of Joselevitz.

Joselevitz's claim that the article implies he operated a "pill mill" is not supported by the record.

■ *Gist of the article.* Based on the Board complaint and orders, as well as the wrongful death lawsuits filed by Roane and Tilley, the *American–Statesman* article fairly and accurately conveyed the gist of these complaints, even assuming the article may have contained errors in some of the details.[17] And, under the doctrine of

16. Generally, an alleged defamatory statement must be one of fact, rather than opinion. *See Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.–Houston [14th Dist.] 1998, pet. denied).

17. To the extent that Joselevitz has complained about other alleged inaccuracies in the article, discussed *supra* in footnote 14, these alleged inaccuracies likewise amount to minor details. They have no impact on the overall gist of the article. *See, e.g., D Magazine*, No. 15-0790, slip op. at 8, —— S.W.3d at

substantial truth, minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting" of the defamatory charge is justified. *Klentzman v. Brady*, 312 S.W.3d 886, 899 (Tex. App.–Houston [1st Dist.] 2009, no pet.) (citing *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex. 1990)); *see also D Magazine*, No. 15–0790, slip op. at 8, —— S.W.3d at ——.

We agree with Cox Media's summation of the article: "The *Statesman* article is a comprehensive investigation of regulatory action against, and the lack of criminal prosecution of, doctors who allegedly violate laws regarding prescription drugs." The article does not, as Joselevitz asserts, paint him as a "vitriolic doctor." To the contrary, only Joselevitz's characterization of the article paints such a picture. *See Avery*, 2016 WL 4208115, at *4–6 ("No reasonable reader would conclude—as argued by Avery—that either he or the Republic of Texas is a 'far-right facist, neoNazi, part of the growing right-wing terrorist threat.' The only evidence of such a conclusion is Avery's own allegations.").

In sum, we conclude that the record reflects that the *American–Statesman* article is substantially true. Therefore, Joselevitz failed in establishing his prima facie case. The TCPA requires that his action be dismissed. *See* Tex. Civ. Prac. & Rem. Code § 27.005.

We sustain Cox Media's second issue.[18]

—— ("[A] publication 'with specific statements that err in the details but that correctly convey the gist of a story is substantially true.'") (quoting *Neely*, 418 S.W.3d at 63–64).

### E. Requests for Attorney's Fees and Sanctions

■■■ Cox Media asserts in its fifth issue that, because it is entitled to dismissal, it is also entitled to recover its uncontroverted "court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require," as well as sanctions "sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter." *See* Tex. Civ. Prac. & Rem. Code § 27.009(a)(1), (2).

We agree that a trial court must award court costs, reasonable attorney's fees, and "other expenses incurred in defending against the action as justice and equity may require." *See id.*; *Sullivan*, 488 S.W.3d at 299. The statute also mandates sanctions "as the court determines sufficient to deter" the filing of similar actions. *See* Tex. Civ. Prac. & Rem. Code § 27.009(a)(2); *see also Avery*, 2016 WL 4208115, at *7 ("Based on the Supreme Court's analysis in *Sullivan*, we hold that—in addition to reasonable attorney's fees—the award of court costs and other expenses incurred in defending against the legal action is mandatory."); *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 500 S.W.3d 26, 49 (Tex. App.–Houston [1st Dist.] 2016, pet. denied) (remanding to trial court on determination that TCPA required dismissal of claims for award of costs, attorney's fees, and other expenses as well as to "impose sanctions on John Moore as the trial court determines sufficient to deter John Moore from brining similar actions"). We disagree, however, that we may render judgment

18. Because of our resolution of Cox Media's first two issues, we need not reach its other issues challenging the trial court's denial of its motion to dismiss. *See* Tex. R. App. P. 47.1.

awarding Cox Media the fees and sanctions it requested in the trial court.

Relying on *Sullivan*, Cox Media asserts that we may enter an award of fees, costs, and sanctions based on the amounts it requested in the trial court because Joselevitz did not controvert those amounts. *See Sullivan*, 488 S.W.3d at 299. In *Sullivan*, Sullivan argued that the Supreme Court of Texas should render judgment for reasonable attorney's fees rather than remand to the trial court because Sullivan's attorney's affidavit was the only evidence of such fees. *Id.* The supreme court, however, determined that remand to the trial court was the proper disposition because (1) Abraham controverted Sullivan's attorney's fee affidavit and (2) the trial court did not consider the sufficiency of the parties' competing affidavits "or otherwise weigh the evidence." *Id.* at 300. In the present case, although Joselevitz did not contest the amount that Cox Media sought for attorney's fees, costs, and sanctions, we decline to render judgment for these amounts because the record does not indicate that the trial court has considered the issue, including "weigh[ing] the evidence." *See id.*

 Generally, the reasonableness of attorney's fees authorized by statute is a question of fact. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). The reasonableness of attorney's fees is ordinarily left to the fact finder, and a reviewing court may not substitute its judgment for that of the fact finder. *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009). Further, the statutory provision authorizing an award of sanctions specifically designates the trial court to determine the amount of sanctions "sufficient to deter the party who brought the legal action from bringing similar actions." Tex. Civ. Prac. & Rem. Code § 27.009(a)(2). Cox Media has

not cited a case in which a court of appeals has awarded reasonable attorney's fees, costs, and sanctions under the TCPA when it determines that the trial court should have dismissed the plaintiff's legal action. Instead, Cox Media acknowledges that "courts of appeals generally require[ ] remand to the trial court for determination of reasonable fees and expenses," as well as remanding for a determination of proper sanctions. *See, e.g.*, *Serafine v. Blunt*, 466 S.W.3d 352, 364 (Tex. App.–Austin 2015, no pet.); *Fitzmaurice v. Jones*, 417 S.W.3d 627, 634 (Tex. App.–Houston [14th Dist.] 2013, no pet.), *disapproved of on other grounds by Lipsky*, 460 S.W.3d at 579; *Schimmel v. McGregor*, 438 S.W.3d 847, 862–63 (Tex. App.–Houston [1st Dist.] 2014, pet. denied). Remand is the proper course. *See D Magazine*, No. 15–0790, slip op. at 21, —— S.W.3d at —— (remanding to trial court for determination of proper amount of attorney's fees).

For the foregoing reasons, we remand to the trial court to (1) award the amount of reasonable attorney's fees, costs, or expenses that justice and equity may require,[19] and (2) impose sanctions, if any, sufficient to deter future similar conduct.

### Conclusion

Cox Media established that the TCPA applies to Joselevitz's defamation claim. *See* Tex. Civ. Prac. & Rem. Code § 27.005(b). And Joselevitz did not establish by clear and specific evidence that the *Austin American–Statesman* article was not substantially true. Thus, he failed to carry his burden under the TCPA to establish a prima facie case for each essential element of his claim, and the trial court should have granted Cox Media's motion to dismiss. *See id.* § 27.005(b), (c). We therefore reverse the trial court's deni-

---

19. As noted above in footnote 10, the justice-and-equity modifier in section 27.009(a) applies only to other expenses. *Sullivan*, 488 S.W.3d at 299.

al of Cox Media's motion to dismiss and remand for proceedings consistent with this opinion. *See id.* § 27.009(a).