**Affirmed and Memorandum Opinion filed December 3, 2020.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00336-CV

**MICHAEL REILLY AND RAVAGO AMERICAS LLC D/B/A GENESIS POLYMERS, Appellants**

**V.**

**PREMIER POLYMERS, L.L.C., Appellee**

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2018-47163**

## M E M O R A N D U M   O P I N I O N

Appellee Premier Polymers, L.L.C. ("Premier") sued Michael Reilly and Ravago Americas LLC d/b/a Genesis Polymers ("Ravago") (together with Reilly, "Appellants"), asserting claims in connection with Appellants' alleged misuse of Premier's trade secrets. Appellants filed a motion to dismiss Premier's claims under the Texas Citizens' Participation Act ("TCPA"). The motion was denied by operation of law and Appellants filed this interlocutory appeal. *See* Tex. Civ. Prac.

& Rem. Code Ann. § 51.014(a)(12). For the reasons below, we affirm the denial of Appellants' motion.

## BACKGROUND

Premier is in the business of acquiring, selling, distributing, and marketing commodity polymers and plastics to end-use markets throughout the United States and Canada. Premier hired Reilly in May 2010 as a sales manager. As part of his employment, Reilly signed a "Confidentiality and Non-Solicitation Agreement" (the "Agreement"), which included two non-solicitation covenants:

> [T]he Employee must agree that, in the event that his employment is terminated for "Cause" or in the event of voluntary resignation, for an eighteen (18) month period, the Employee will not, directly or indirectly, either for himself or through any kind of ownership as a director, agent, employee, or consultant, for any other person, firm, or corporation, call on, solicit, take away, or cause the loss of suppliers, customers or clients of [Premier] with whom the Employee became acquainted during his employment nor, suppliers, customers or clients of [Premier] that he was acquainted with prior to his employment, but with whom [Premier] has transacted business in the previous twelve (12) months.
>
> \*               \*               \*
>
> If the Employee is terminated by [Premier] for reasons other than "Cause", for a twelve (12) month period, the Employee will not, directly or indirectly, either for himself or through any kind of ownership as a director, agent, employee, or consultant, for any other person, firm, or corporation, call on, solicit, take away, or cause the loss of suppliers, customers or clients of [Premier] with whom the Employee became acquainted during his employment nor, suppliers, customers or clients of [Premier] that he was acquainted with prior to his employment, but with whom [Premier] has transacted business in the previous twelve (12) months.

Reilly worked at Premier for seven years, as both a salesperson and as a regional manager. In these roles, Reilly sold plastic resin products by calling on customers

2

in his assigned region.  According to Premier, Reilly administered and directly sold to at least 54 customer accounts.

In May 2017, Reilly resigned from Premier and shortly thereafter began working as a regional sales manager for Ravago.  Like Premier, Ravago is in the business of selling resin products.  Approximately eight months into his employment with Ravago, Reilly received a letter from Premier reminding him of his "obligations" in connection with the Agreement's 18-month non-solicitation covenant.

Premier sued Reilly in July 2018, seeking a declaration that the Agreement was enforceable.  Premier twice amended its petition and added Ravago as a defendant.  In addition to its request for a declaratory judgment, Premier asserted four claims in its live pleading:  breach of contract (against Reilly); tortious interference with contract (against Ravago); tortious interference with business relationships (against both Appellants); and violations of the Texas Uniform Trade Secrets Act (against both Appellants).

Appellants filed a TCPA motion to dismiss challenging Premier's four claims.  A hearing on Appellants' motion was held on March 8, 2019, and Appellants' motion was denied by operation of law.  *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.005(a), 27.008(a) (if the trial court does not rule on a TCPA motion to dismiss within 30 days of the hearing on the motion, the motion is overruled by operation of law).[1]  Appellants timely filed this interlocutory appeal. *See id*. § 51.014(a)(12).

**ANALYSIS**

Although its TCPA motion sought dismissal of all four of Premier's claims,

---

[1] The trial court also signed an order on June 13, 2019, denying Appellants' motion.

3

on appeal Appellants only challenge the trial court's denial of their motion with respect to Premier's claims for (1) violations of the Texas Uniform Trade Secrets Act, and (2) tortious interference with a contract. In its trade-secrets claim, Premier alleges Reilly acquired Premier's confidential customer information and business plans during his employment with the company and improperly used this information to solicit customers for Ravago. Premier's tortious-interference claim alleges that Ravago induced Reilly to breach his obligations under the Agreement's non-solicitation covenant to refrain from soliciting and selling to Premier customers.

Within these two challenges, Appellants raise four arguments:

1. the TCPA applies to Premier's claims;
2. Premier failed to prove a prima facie case of its claims by clear and specific evidence;
3. Appellants established a defense to the tortious-interference claim; and
4. the trial court erred by not awarding Appellants their attorney's fees and costs.

We address these issues below.

## I.     TCPA Framework

In enacting the TCPA, the Legislature sought to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002; *see Toth v. Sears Home Improvement Prods., Inc.*, 557 S.W.3d 142, 149 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Balancing these interests, the TCPA provides a mechanism for trial courts to identify and summarily dispose of those suits

4

designed only to chill First Amendment rights. *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding); *Reeves v. Harbor Am. Cent., Inc.*, 552 S.W.3d 389, 393 (Tex. App.—Houston [14th Dist.] 2018, pet. filed). The TCPA is not intended to bring about the dismissal of meritorious lawsuits. *In re Lipsky*, 460 S.W.3d at 589; *Reeves*, 552 S.W.3d at 393.

The TCPA utilizes a three-step process.[2] First, the burden is on the movant to show by a preponderance of the evidence that the plaintiff's claim "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." Act of May 21, 2011, 82nd Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 962 (amended 2019) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 27.005). Next, the burden shifts to the plaintiff to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id*. If the plaintiff satisfies this second step, the trial court nonetheless shall dismiss the plaintiff's claim if the movant "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id*.

We review *de novo* the trial court's ruling on a TCPA motion to dismiss. *Roach v. Ingram*, 557 S.W.3d 203, 217 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Pursuant to this standard, we "make an independent determination and apply the same standard used by the trial court in the first instance." *Cox*

---

[2] The Texas Legislature amended the TCPA in its most recent legislative session and the amendments are effective September 1, 2019. Because this suit was filed before the effective date of the amendments, it is governed by the statute as it existed before the amendments and all of our citations are to the TCPA as it existed prior to September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1-12, 2019 Tex. Gen. Laws 684, 684-87 (current versions at Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011); *see, e.g., HDG, Ltd. v. Blaschke*, No. 14-18-01017-CV, 2020 WL 1809140, at *3 n.2 (Tex. App.—Houston [14th Dist.] Apr. 9, 2020, no pet.) (mem. op.).

*Media Grp., LLC v. Joselevitz*, 524 S.W.3d 850, 859 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (internal quotation omitted). We review the pleadings and the relevant evidence in the light most favorable to the non-movant. *Hieber v. Percheron Holdings, LLC*, 591 S.W.3d 208, 211 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

## II.      Preemption by the Texas Covenant Not to Compete Act

Before turning to the TCPA's three-step process, we begin with Premier's contention that the Texas Covenants Not to Compete Act (the "Non-Compete Act") preempts the TCPA's application to its tortious-interference claim. *See* Tex. Bus. & Com. Code Ann. §§ 15.50-.52 (the Non-Compete Act).[3]  Premier's argument rests on section 15.52, which states that "the procedures and remedies" in the Non-Compete Act "are exclusive and preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise." *Id*. § 15.52.

We recently addressed this issue in *Reeves v. Harbor American Central, Inc.*, __ S.W.3d __, 2020 WL 2026527 (Tex. App.—Houston [14th Dist.] Apr. 28, 2020, pet. filed). There, the plaintiff argued that the TCPA did not apply to its counterclaims because the TCPA conflicted with the specific procedures and remedies provided under the Non-Compete Act. *Id*. at *5.  Rejecting this argument, we explained that "the TCPA and the [Non-Compete Act] govern different stages of litigation." *Id*. at *6. "[D]iscern[ing] no friction between the

---

[3] Premier raised this issue in its response to Appellants' motion to dismiss filed in the trial court, thereby preserving the issue for appellate review. *See Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 890-91 (Tex. App.—Austin 2018, pet. denied) (holding that the plaintiffs' failure to raise preemption challenge in the trial court waived the issue on appeal).

two statutory schemes," we concluded that the TCPA does not abrogate any of the Non-Compete Act's procedures or remedies. *Id*. at \*6; *see also RigUp, Inc. v. Sierra Hamilton, LLC*, __ S.W.3d __, 2020 WL 4188028, at \*5 (Tex. App.—Austin July 16, 2020, no pet. h.) (citing *Reeves* and overruling the plaintiff's argument that the Non-Compete Act preempts the TCPA).

Guided by *Reeves*, we conclude that the Non-Compete Act does not preempt the TCPA. In a plain reading of the statute, the Non-Compete Act expresses an intention to govern only final remedies. *See Reeves*, 2020 WL 2026527, at \*6; *see also EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 695 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (explaining that the Non-Compete Act governs only final remedies); *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236-40 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (conducting a comprehensive analysis of the Non-Compete Act and concluding that the Act was intended to govern only final remedies). Conversely, the TCPA provides procedures for the summary dismissal of cases — of all types — before a full adjudication of the merits. *See In re Lipsky*, 460 S.W.3d at 589 ("[t]he TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights"); *see also RigUp, Inc.*, 2020 WL 4188028, at \*5. Therefore, because the TCPA and the Non-Compete Act govern different stages of trial court proceedings, the Non-Compete Act does not preempt the TCPA. *See RigUp, Inc.*, 2020 WL 4188028, at \*5-6; *Reeves*, 2020 WL 2026527, at \*6.

We overrule Premier's argument that the Non-Compete Act preempts the TCPA's application to its tortious-interference claim.

## III.     Prima Facie Case

Premier does not contest that its trade-secret and tortious-interference claims relate to a right protected by the TCPA. *See* Act of May 21, 2011, 82nd Leg., R.S.,

ch. 341, 2011 Tex. Gen. Laws 961, 962 (amended 2019). We therefore proceed to the second step of the TCPA analysis: whether Premier established by "clear and specific" evidence a prima facie case for each essential element of its claims. *See id*.

The TCPA does not define "clear and specific", so we apply those terms' ordinary meanings: "clear" means "unambiguous", "sure", or "free from doubt", and "specific" means "explicit" or "relating to a particular named thing". *See In re Lipsky*, 460 S.W.3d at 590. As the Texas Supreme Court has explained, this standard requires the plaintiff to "provide enough detail to show the factual basis for its claim". *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam). A "prima facie case" refers to the quantum of evidence required to satisfy the non-movant's minimum factual burden and generally refers to an amount of evidence that is sufficient as a matter of law to support a rational inference that an allegation of fact is true. *In re Lipsky*, 460 S.W.3d at 590; *see also Toth*, 557 S.W.3d at 149. Although the TCPA "initially demands more information about the underlying claim, the Act does not impose an elevated evidentiary standard or categorically reject circumstantial evidence." *In re Lipsky*, 460 S.W.3d at 591.

We apply these standards to Premier's pleadings and evidence to determine whether it marshaled "clear and specific" evidence to support the elements of its causes of action. *See Fawcett v. Grosu*, 498 S.W.3d 650, 659 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting the "Texas Supreme Court's interpretation that 'pleadings and evidence' setting forth the factual basis for a claim are sufficient to resist a TCPA motion to dismiss") (quoting *In re Lipsky*, 460 S.W.3d at 591); *see also Jetall Cos., Inc. v. Van Dyke*, No. 14-19-00104-CV, 2019 WL 2097540, at *4 (Tex. App.—Houston [14th Dist.] May 14, 2019, no pet.) (mem. op.).

## A.  Misappropriation of Trade Secrets

To prevail on a claim for a violation of the Texas Uniform Trade Secrets Act ("TUTSA"), the plaintiff must show that (1) the plaintiff owned a trade secret; (2) the defendant misappropriated it; and (3) the misappropriation caused injury that warrants injunctive relief or damages. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.002(1), (3), (6), 134A.004; *see also EJ Madison, LLC v. Pro-Tech Diesel, Inc.*, 594 S.W.3d 632, 643 (Tex. App.—El Paso 2019, no pet.); *Morgan v. Clements Fluids S. Tex., LTD.*, 589 S.W.3d 177, 186 (Tex. App.—Tyler 2018, no pet.).[4]

Appellants contend Premier did not present a prima facie case of its TUTSA claim because it "did not establish that its information is a trade secret." Responding to this argument, Premier asserts that its trade-secrets claim is premised on two types of information:  its customer database entries and its business plans.  Our analysis focuses on the first category of information.

TUTSA defines "trade secret" to include "all forms and types of information, including . . . list[s] of actual or potential customers" if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

---

[4] TUTSA "applies to the misappropriation of a trade secret made on or after" the Act's effective date of September 1, 2013.  Act of Apr. 23, 2013, 83d Leg., R.S., ch. 10, §§ 3, 4, 2013 Tex. Gen. Laws 12, 14.  TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."  Tex. Civ. Prac. & Rem. Code Ann. § 134A.007(a).

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6); *see also Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 361 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (the plaintiff's trade-secret evidence included "contact lists, . . . and current and prospective client databases"); *Kana Energy Servs., Inc. v. Jiangsu Jinshi Mach. Grp. Co.*, 565 S.W.3d 347, 355 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Trade secrets may include customer lists, customer contact information, pricing information, and market strategies.").

As the first prong of this standard states, a trade secret must be a secret. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6)(a). "Secrecy" in this context is not limited solely to confidentiality; it also requires that the information is not generally known or readily ascertainable by independent investigation. *Glob. Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied).

Here, Appellants argue Premier failed to show that its customer database entries contain information not readily ascertainable by independent means. Appellants contend Premier presented no evidence that this information is something "its competitors either did not know or could not learn simply by asking."

We disagree. Included with Premier's TCPA response were excerpts from Reilly's deposition, during which he was questioned about Premier's customer database. Reilly agreed that, during his time at Premier, he "ha[d] access to databases that contained information about customer orders". Reilly stated that the customer database could be used to extract sales data specific to certain customers, products, and time frames. Agreeing that the database could be used to create and download reports showing this sales information, Reilly testified that while

10

working at Premier, he regularly downloaded and printed these types of reports. Reilly acknowledged that the customer database was contained in a system that required users "to log into" to use.

The excerpts from Reilly's deposition show how the information in Premier's customer database is compiled and the steps Premier takes to maintain this information's secrecy. This evidence shows that Premier's customer database entries are not ascertainable by independent means; rather, this information includes relevant contacts (*i.e.*, the authorized buyers), how to reach those contacts, and those contacts' purchase histories. The customer database also includes certain sales data which, as Reilly testified, could generate reports specific to certain customers, products, and time frames. This information is not available to anyone who "asks" — rather, the pleadings and evidence show that Premier's customer database may be accessed only by a limited subset of employees who login with the required credentials. This evidence is clear and specific and provides a sufficient factual basis to support Premier's trade-secrets claim. *See In re Lipsky*, 460 S.W.3d at 590; *Bedford*, 520 S.W.3d at 904; *see also, e.g., Universal Plant Servs., Inc.*, 571 S.W.3d at 361 (prima facie evidence of trade secrets' "secrecy" included evidence that non-movant "used password protected computers [and] limited employee access to the information"); *Morgan*, 589 S.W.3d at 187 (non-movant satisfied TCPA's prima facie standard with respect to its trade-secrets claim because its petition detailed that it "spent considerable time and resources" developing its propriety information and that it "took reasonable precautions to prevent disclosure of this information to third parties").

Because we conclude that Premier's evidence regarding its customer database entries is sufficient to meet its burden under the TCPA, we do not address the parties' contentions regarding whether Premier's business plans constitute a

trade secret.

## B. Tortious Interference with Contract

Premier alleges that Ravago tortiously interfered with Reilly's Agreement with Premier by inducing Reilly to solicit and sell to Premier customers. Specifically, Premier contends that Reilly was assigned "to cover the same territory as he was working for Premier" and was "expressly instructed . . . not to honor his non-solicitation obligations" regarding Premier's customers.

The elements of tortious interference with a contract are (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *McGehee v. Hagan*, 367 S.W.3d 848, 854 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Appellants argue that Premier failed to make a prima facie case of its tortious-interference claim because it did not "present clear and specific evidence of either causation or damages." Appellants do not challenge the existence of a contract subject to interference.

### 1. Causation

Proximate cause requires proof of cause-in-fact and foreseeability. *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875, 880 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Cause-in-fact examines whether the tortious conduct was a substantial factor in bringing about the alleged injury, *i.e.*, a factor without which the injury would not have occurred. *Id*. And an injury is foreseeable if a person of ordinary intelligence and prudence would have reasonably anticipated it under the circumstances. *Id*.

Addressing this element, Premier's second amended petition alleges the following: (1) while working at Premier, Reilly sold products to four separate

12

companies that were Premier's customers; (2) before and during his employment at Ravago, Reilly informed certain Ravago managers of his relationships with these customers; (3) one of Reilly's managers at Ravago, Anthony Segale, instructed Reilly to pursue sales from these customers and assisted Reilly in maintaining these customer relationships; (4) Reilly continued to solicit business from these customers and made substantial sales to these customers on behalf of Ravago; (5) these sales were for products that Premier previously had sold to these customers; and (6) at the time these sales were made, Premier had the products in stock and had the ability to complete the orders. For all four companies, Premier alleges that, "[b]ut for Reilly's solicitation, Premier could have and, based on historical sales data, would have profitably made these same sales".

To support these allegations, Premier submitted into evidence emails and text messages between Reilly and these companies' representatives in which Reilly solicited and completed sales of Ravago products. In some of the text messages, Reilly also coordinated with the representative to set up meetings between the representative, Segale, and Reilly:

- Company Alpha: Premier submitted evidence showing two purchase orders from Company Alpha purchasing approximately $60,000 worth of Ravago products in January 2019. Premier also submitted text messages between Reilly and a Company Alpha representative sent from June 2018 through November 2018. In some of these messages, Reilly organized the sale of certain Ravago products to Company Alpha.

- Company Bravo: Premier submitted emails from Reilly to a Company Bravo representative sent in September 2017 in which Reilly offered certain Ravago products for sale and coordinated product delivery. Premier also submitted text messages between Reilly and a Company Bravo representative sent from July 2017 through January 2019. In some of these messages, Reilly offered and completed sales of certain Ravago products. The text messages also discussed a December 2017 dinner between the Company Bravo

13

representative, Segale, and Reilly.

- Company Charlie:  Premier submitted text messages between Reilly and a Company Charlie representative sent from June 2017 through January 2019.  In some of these messages, Reilly offered and completed sales of certain Ravago products.  Reilly also sent text messages to the same representative to organize a meeting between the representative, Segale, and Reilly.

- Company Delta:  Premier submitted text messages between Reilly and a Company Delta representative from June 2017 through August 2017.  In some of these messages, Reilly offered and completed sales of certain Ravago products.

At his deposition, Reilly testified as follows regarding Segale's role with respect to Reilly's sale of Ravago products to former Premier customers:

Q.  Right.  So when — when these customers that you had been selling to for Premier came to you and asked to buy product [from Ravago], you told [Segale] that those customers had contacted you.  Right?

A.  Yes.

Q.  And you — you told — had told [Segale] at some point that these were customers that you had once sold to on behalf of Premier.  Correct?

A.  Possibly.  Yes.

Q.  Okay.  And at some point before February of 2018, you had a conversation with [Segale] where he expressed an agreement with this view of yours that as long as the customer initiated the communication, that you didn't have anything to worry about under the non-solicitation.  Is that true?

A.  I — I'm not a lawyer, so I don't know what the — but it was — since they contacted me and were looking for product, they initiated the — the conversation.

\*          \*          \*

Q.  . . .   And when Segale had this conversation with you about following your non-solicitation in the summer of 2017, did he provide you with any guidance as to how you were supposed to

14

achieve that or did he just say follow it?

A.  Follow the — the — that we weren't going to sell the customers. I was not going to sell the customers that I sold while I — that I sold at Premier.

Q.  And your — your testimony is you followed those instructions?

A.  There were some unique circumstances when those — that changed due to the customers contacting me.

Q.  Right. And when those customers contacted you, did you then contact Segale to make sure that it was okay with him for you to go ahead and make that sale despite his earlier instructions?

A.  I don't recall in every event.

Q.  Did you ever do that?

A.  I think I — we had a conversation if someone contacted me looking for material. Yes.

This evidence provides a factual basis sufficient to support the rational inference that Ravago's willful and intentional interference with Reilly's non-solicitation covenant proximately caused Premier injury. *See In re Lipsky*, 460 S.W.3d at 590; *Toth*, 557 S.W.3d at 149. Ravago (through Reilly) made sales to customers Reilly sold to while employed with Premier. Premier also submitted into evidence emails and text messages between Reilly and these customers' representatives sent after Reilly began his Ravago employment. In this correspondence, Reilly (1) offered and completed sales on behalf of Ravago, and (2) organized meetings between certain representatives, himself, and Segale. At his deposition, Reilly agreed that he kept Segale abreast of his interactions with former Premier customers; Reilly also testified that he and Segale discussed the propriety of making sales to these customers in light of Reilly's non-solicitation covenant. This evidence provides a factual basis sufficient to support the causation element of Premier's tortious-interference claim.

Relying on our sister court's decision in *Schimmel v. McGregor*, 438 S.W.3d

15

847 (Tex. App.—Houston [1st Dist.] 2014, pet. denied), Appellants argue that the allegations in Premier's petition and the evidence submitted in support of its response to the motion to dismiss are nothing more than "conclusory assertions" that are insufficient to meet Premier's burden under the TCPA. In *Schimmel*, a group of homeowners sued an attorney for tortiously interfering with their attempts to sell their properties to the City of Galveston. *Id*. at 849. The attorney filed a TCPA motion to dismiss, which the trial court denied. *Id*. at 851, 854. Reversing the denial, our sister court pointed out that the homeowners' only evidence of causation was statements in their affidavits averring that but for the attorney's misrepresentations and conduct, there was a reasonable probability their contracts with the City of Galveston would have closed. *Id*. at 860. But "[e]vidence of [the attorney's] conduct, by itself" did not establish a prima facie case, and the fact that the attorney's alleged conduct occurred "roughly contemporaneously" with the contracts' failure to close did "not establish that [the attorney's] conduct *caused* the governmental agencies to act as they did." *Id*. at 860-61 (emphasis in original).

But here, Premier's evidence of causation is more robust than that of the homeowners in *Schimmel*. Premier does not merely contend that the relevant events occurred contemporaneously. Rather, Premier's evidence (including the text messages, emails, and Reilly's deposition) demonstrates that after Reilly left Premier and began his employment at Ravago: (1) Segale knew about Reilly's non-solicitation covenant with Premier and had discussions with Reilly about his obligations; (2) Reilly informed Segale when customers he previously had sold to while working at Premier contacted him; (3) Segale participated in meetings with Reilly and some of these customers' representatives; and (4) Reilly, on behalf of Ravago, made sales to these customers. This evidence provides a sufficient factual basis to support the causation element of Premier's tortious-interference claim.

16

*See Immobiliere Jeuness Establissement*, 525 S.W.3d at 880.

## 2. Damages

A nonmovant is "not required to provide evidence sufficient to allow an exact calculation" of its actual damages in order to meet its burden under the TCPA. *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 848 (Tex. 2018); *see also Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 689 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (a TCPA nonmovant is not required to adduce evidence proving the "amount or constituent parts" of its claimed damages). But general averments of direct economic losses and lost profits, without more, does not satisfy the minimum requirements of the TCPA. *In re Lipsky*, 460 S.W.3d at 592. Instead, the nonmovant must present evidence sufficient to support a rational inference as to the existence of damages. *S & S Emergency Training Sols., Inc.*, 564 S.W.3d at 848 (concluding that the nonmovant only was required to produce evidence that the movant's actions "caused it to lose *some* specific, demonstrable profits") (emphasis in original); *see also Universal Plant Servs., Inc.*, 571 S.W.3d at 359-60 (evidence that the nonmovant will suffer "lost revenue and increased competition on bids" as a result of its former employees' actions sufficient to establish a prima facie case of damages).

Our analysis of this issue is guided by other courts' application of the TCPA framework in the context of a tortious-interference claim. Similar to the facts at issue here, the parties in *Stallion Oilfield Services Ltd. v. Gravity Oilfield Services, LLC* competed in the same market and, in 2018, Stallion hired away one of Gravity's employees. 592 S.W.3d 205, 212-13 (Tex. App.—Eastland 2019, pet. denied). Analyzing whether Gravity established a prima facie case of damages for its tortious-interference claim, the court of appeals noted that Gravity produced evidence showing that, after Stallion hired its former employee: (1) one of

17

Gravity's customers terminated its contract with Gravity for the rental of two natural gas power generators; (2) that customer then placed the exact same rental order with Stallion; and (3) Stallion knew when it rented the generators that the customer previously had been a customer of Gravity. *Id*. at 220. The court also pointed to an affidavit from Gravity's vice president in which he averred that Gravity would "see increased competition for rental bids" due to Stallion's conduct. *Id*. at 220. This evidence, the court concluded, was "sufficient to support a rational inference as to the existence of damages" flowing from Stallion's actions. *Id*.

In *Neurodiagnostic Consultants, LLC v. Nallia*, the plaintiff, a provider of intraoperative neuropsychological monitoring services, sued the defendant-employer after the defendant hired one of the plaintiff's former employees. No. 03-18-00609-CV, 2019 WL 4231232, at *1 (Tex. App.—Austin Sept. 6, 2019, no pet.) (mem. op.). Concluding the plaintiff met its TCPA burden with respect to the damages element of its tortious-interference claim, the court noted that the plaintiff "alleged and presented evidence" showing that certain doctors had worked with the employee during her employment with the plaintiff but, after the employee was hired by the defendant, those same doctors "stopped engaging [the plaintiff] and began using [the defendant] to perform . . . services." *Id*. at *10-11. This evidence, viewed in the light most favorable to the plaintiff, "presented a prima facie case that [the plaintiff] suffered economic injury as a result of the [defendant's] wrongful conduct." *Id*. at *11.

Like the nonmovants in *Stallion Oilfield Services* and *Neurodiagnostic Consultants*, Premier's evidence is sufficient to establish a prima facie case of damages. As we outlined above, Premier submitted emails and text messages showing that Reilly offered and completed sales of Ravago products to four

18

companies: Alpha, Bravo, Charlie, and Delta. Reilly testified at his deposition that, while he was employed by Premier, he specifically knew that these four companies were customers of Premier. This evidence supports a rational inference as to the existence of damages stemming from Ravago's tortious interference with Reilly's non-solicitation covenant, namely, increased competition for product sales, loss of certain customers, and lost sales. *See Stallion Oilfield Servs. Ltd.*, 592 S.W.3d at 220-21; *Neurodiagnostic Consultants, LLC*, 2019 WL 4231232, at *11.

Appellants contend that Premier "has not presented evidence of any damages sustained as a result of Reilly and Ravago's alleged wrongful solicitation." But the cases Appellants rely on to support this contention do not apply the TCPA's framework; instead, they review the sufficiency of the evidence to support the factfinder's award of damages. *See Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 860-61 (Tex. 2017); *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278 (Tex. 2015); and *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). The TCPA applies a different standard with respect to the non-movant's evidentiary burden. *See In re Lipsky*, 460 S.W.3d at 590 (under the TCPA, a "prima facie case" refers to the quantum of evidence required to satisfy the non-movant's ***minimum*** factual burden) (emphasis added). And here, Premier's submitted evidence is sufficient to meet that standard.

We conclude that Premier met its evidentiary burden and established a prima facie case with respect to its trade-secrets and tortious-interference claims.

## IV.     Appellants' Defense

Even if the non-movant makes a prima facie case with respect to its claims, the trial court nonetheless shall dismiss the non-movant's claims if the movant "establishes by a preponderance of the evidence each essential element of a valid

defense to the nonmovant's claim." *See* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 962 (amended 2019). Asserting that they met their burden here, Appellants argue that Premier's tortious-interference claim should be dismissed because the Agreement's non-solicitation covenant is unenforceable.

Premier raises three arguments in response:

1. Appellants waived their enforceability defense by failing to raise it until the TCPA's 60-day deadline for filing TCPA motions had passed. *See* Act of May 21, 2011, 82d Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 962 (amended 2019) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 27.003) ("A motion to dismiss a legal action under [the TCPA] must be filed not later than the 60th day after the date of service of the legal action.").

2. In the TCPA context, "enforceability" is an element of Premier's prima facie case rather than an affirmative defense.

3. Appellants did not prove each essential element of their enforceability defense by a preponderance of the evidence.

We presume without deciding that Appellants did not waive the enforceability issue and that this issue properly may be raised as an affirmative defense. We proceed to examine the merits of Appellants' enforceability defense.

Reilly's Agreement with Premier includes the following non-solicitation covenant:

[T]he Employee must agree that, in the event that his employment is terminated for "Cause" or in the event of voluntary resignation, for an eighteen (18) month period, the Employee will not, directly or indirectly, either for himself or through any kind of ownership as a director, agent, employee, or consultant, for any other person, firm, or corporation, call on, solicit, take away, or cause the loss of suppliers, customers or clients of [Premier] with whom the Employee became acquainted during his employment nor, suppliers, customers or clients of [Premier] that he was acquainted with prior to his employment, but with whom [Premier] has transacted business in the previous twelve (12) months.

20

As we explained in *Rieves v. Buc-ee's Ltd.*, 532 S.W.3d 845 (Tex. App.—Houston [14th Dist.] 2017, no pet.), the Texas Supreme Court has concluded that covenants limiting employees' professional mobility are unlawful restraints on trade unless they fall within the exception created by Texas' Non-Compete Act. *Id*. at 850 (citing *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 776 (Tex. 2011)). Under this exception, a non-solicitation covenant (like the one here) is enforceable only "to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code Ann. § 15.50(a). Citing this standard, Appellants argue that (1) the covenant's 18-month term is punitive, and (2) the scope of the covenant is overly broad. We consider these arguments separately.

## A.     The Covenant's 18-Month Term is Not Punitive.

With respect to the duration of a non-solicitation covenant, "[t]wo to five years has repeatedly been held as a reasonable time". *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Arevalo v. Velvet Door, Inc.*, 508 S.W.2d 184, 186 (Tex. Civ. App.—El Paso 1974, writ ref'd n.r.e.); *Elec. Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex. Civ. App.—Dallas 1974, no writ)); *see also Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 WL 3543583, at *10 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op.) (citing *Gallagher* and holding that a non-solicitation clause's two-year duration was not unreasonable); *Salas v. Chris Christensen Sys., Inc.*, No. 10-11-00107-CV, 2011 WL 4089999, at *19 (Tex. App.—Waco Sept. 14, 2011, no pet.) (mem. op.) (citing *Gallagher* and holding that a non-solicitation clause's five-year duration was not "per se unreasonable").

Appellants do not cite any authority that holds otherwise, nor do they cite

any cases where a non-solicitation clause with a duration of less than two years was held unenforceable. Given that a two-to-five year period generally has been held reasonable, we reject Appellants' contention that the non-solicitation covenant's 18-month duration is punitive. *See Smith*, 2019 WL 3543583, at *10; *Salas*, 2011 WL 4089999, at *19; and *Gallagher Healthcare Ins. Servs.*, 312 S.W.3d at 655.

Appellants also point out that, under the Agreement, employees terminated for reasons other than for "cause" are only subject to a one-year non-solicitation duration. Appellants contend the additional six-month period for those employees (like Reilly) that voluntarily resign "is an impermissible, anticompetitive attempt to discourage employees from leaving and punish the ones who do."

But Appellants do not cite any case law or other authority to support their contention that employees may not be subject to different non-solicitation durations based on the circumstances surrounding their departure. We decline to adopt that standard here — particularly where the 18-month period at issue is well-within what other courts have deemed reasonable. *See Smith*, 2019 WL 3543583, at *10; *Salas*, 2011 WL 4089999, at *19; and *Gallagher Healthcare Ins. Servs.*, 312 S.W.3d at 655.

### B. The Covenant's Scope is Not Overly Broad.

Arguing the non-solicitation covenant is overly broad, Appellants contend the clause (1) impermissibly prohibits Reilly from soliciting customers that he did not personally serve while working at Premier, and (2) impermissibly restricts Reilly from soliciting the customers that he brought to Premier.

These arguments overstate the scope of the Agreement's non-solicitation covenant. For an 18-month period, the non-solicitation covenant prohibits Reilly's

22

solicitation of two categories of "suppliers, customers or clients":[5]

1. those that Reilly "became acquainted" with during his Premier employment; and

2. those that Reilly "was acquainted" with prior to his Premier employment and with whom Premier transacted business in the previous 12 months.

The cases Appellants cite analyze covenants broader than the one at issue here. Appellants rely on cases holding that an employer may not restrain a former employee's solicitation of clients with whom the employee had *no* dealings during his employment. *See Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991) ("We hold that the provision in question here is unreasonable because it applies to clients who first became clients after the accountant left the firm or with whom the departing partner had no contact while he was at the prior firm."); *U.S. Risk Ins. Grp., Inc. v. Woods*, 399 S.W.3d 295, 301 (Tex. App.—Dallas 2013, no pet.) (non-competition provision was not reasonable where it prohibited the former employee from "being associated with or employed by any business that competes in the business currently engaged in by [employer] or any of its subsidiaries"; "business" was not limited to the type of work the former employee performed).

Appellants also cite cases in which the provisions at issue instituted a *total prohibition* on contacting customers whom the employee knew prior to his employment with the plaintiff-employer. *See Cardinal Health, Inc. v. Gasbarrino*, No. 05-02-01222-CV, 2003 WL 253596, at *1-2 (Tex. App.—Dallas Feb. 6, 2003,

---

[5] When construing non-solicitation provisions, we give terms their plain, ordinary, and generally accepted meanings unless the contract shows otherwise. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *see also Bellefeuille v. Equine Sports Med. & Surgery, Weatherford Div., PLLC*, No. 02-15-00268-CV, 2016 WL 1163364, at *5 (Tex. App.—Fort Worth Mar. 24, 2016, no pet.) (mem. op.).

no pet.) (mem. op.) (holding that "it was within the trial court's discretion to allow [the former employees] to compete against [the plaintiff-employer] using the experience, knowledge, and relationships they acquired prior to their employment relationship") (emphasis added); *Birk v. Hub Int'l Sw. Agency Ltd.*, No. EP-08-CA-259-FM, 2009 WL 10701860, at *22-25 (W.D. Tex. Apr. 1, 2009) (holding it was "unreasonable" that the former employee be barred from soliciting clients he "cultivated before he joined" the plaintiff-employer).

The limitations at issue here cannot be grouped with these lines of authority. The non-solicitation covenant does not prohibit Reilly from soliciting *any* Premier customer, but only those he became "acquainted" with during his employment. The covenant does not prohibit Reilly from soliciting *any* of the customers he developed relationships with before his Premier employment, but only those with whom Premier transacted business in the previous 12 months.

Moreover, the Non-Compete Act institutes a two-part analysis with respect to the enforceability of non-solicitation covenants, under which the covenant's limitations must (1) be reasonable, and (2) "not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code Ann. § 15.50(a). Applying this framework, we have considered evidence addressing the second prong, *i.e.*, the employer's goodwill or business interests that it seeks to protect. *See, e.g., Forum US, Inc. v. Musselwhite*, No. 14-17-00708-CV, 2020 WL 4331442, at *7 (Tex. App.—Houston [14th Dist.] July 28, 2020, no pet.) (mem. op.) (highlighting testimony from the plaintiff-employer's representative that the non-competition provision's "prohibition is probably greater than necessary to protect [the plaintiff's] goodwill or business interests"); *Rieves*, 532 S.W.3d at 851-52 (noting that "[t]hese provisions go far beyond protecting any legitimate competitive interest" of the plaintiff-employer);

24

and *Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (pointing out that the plaintiff-employer "submitted evidence to show that it limited its competitors to twenty companies" that were "primarily oil and gas consulting firms").

Here, Appellants do not point to any evidence regarding Premier's goodwill or business interests, nor do they explain how these considerations intersect with the limitations in Reilly's non-solicitation covenant. Without this evidence, we cannot determine whether these limitations exceed the Non-Compete Act's parameters. *See Forum US, Inc.*, 2020 WL 4331442, at *7; *Rieves*, 532 S.W.3d at 851-52; and *Curtis*, 12 S.W.3d at 119.

We conclude that Appellants did not meet their burden under the TCPA and did not establish each element of their defense by a preponderance of the evidence. *See* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 962 (amended 2019).

## CONCLUSION

In summary, we conclude (1) the Texas Covenants Not to Compete Act does not preempt the TCPA's application to Premier's tortious-interference claim; (2) Premier established a prima facie case with respect to the challenged elements of its trade-secret and tortious-interference claims; and (3) Appellants did not establish by a preponderance of the evidence each element of their affirmative defense. Therefore, we affirm the trial court's denial of Appellants' TCPA motion to dismiss.


/s/    Meagan Hassan
       Justice


Panel consists of Justices Bourliot, Hassan, and Poissant.

25