**Opinion issued April 25, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00281-CV

———————————

**PROPUBLICA, INC., HEARST NEWSPAPERS, LLC D/B/A THE HOUSTON CHRONICLE, CHARLES ORNSTEIN, AND MICHAEL HIXENBAUGH, Appellants**

**V.**

**DR. O. HOWARD "BUD" FRAZIER, Appellee**

---

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2018-45639

---

**MEMORANDUM OPINION**

In this interlocutory appeal, four media defendants bring their second challenge to the trial court's denial of their motion to dismiss, under the Texas Citizens Participation Act ("TCPA"), the defamation claim against them.[1]

Dr. O. Howard "Bud" Frazier is considered one of the world's leading heart-transplant surgeons and a pioneer in the development of the Left Ventricular Assist Device ("LVAD"), a surgically implanted medical device that assists a patient's heart with circulating blood when it can no longer do so on its own.

In 2018, ProPublica, Inc. and its journalist Charles Ornstein, along with Hearst Newspapers, LLC, doing business as The Houston Chronicle, and its journalist Michael Hixenbaugh (collectively, "the Publishers"), jointly published an article about Dr. Frazier's work, titled "A Pioneering Heart Surgeon's Secret History of Research Violations, Conflicts of Interest and Poor Outcomes."

Dr. Frazier sued the Publishers for defamation, asserting that the article constituted "a vicious and utterly ill-founded libel" that "reduced his life-saving accomplishments to no more than a quest for personal glory at the expense of his patients' health."

---

[1] Because this case was filed prior to the effective date of the 2019 amendments to the TCPA, the prior version of the statute governs this appeal. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684; *see also id*. at §§ 11–12, 2019 Tex. Gen. Laws at 687.  All references in this opinion to Texas Civil Practice and Remedies Code Chapter 27 are to the former version of the statute.

The Publishers moved to dismiss Dr. Frazier's suit under the TCPA, and the trial court denied their motion.

The Publishers appealed. Concluding that the trial court erred in refusing to consider the Publishers' arguments and evidence in support of their defenses, we reversed and remanded for further proceedings. *See ProPublica, Inc. v. Frazier*, No. 01-19-00009-CV, 2020 WL 370563, at *10 (Tex. App.—Houston [1st Dist.] Jan. 23, 2020, pet. denied) (mem. op.).

On remand, the Publishers' TCPA motion to dismiss was again denied.

The Publishers once again appeal. In their sole issue, the Publishers contend that the trial court erred in denying their motion to dismiss the suit because Dr. Frazier did not meet his burden under the TCPA to establish the elements of his defamation claim and because the Publishers established their defenses.

We reverse and remand.

## Background

At the time of the events, Dr. Frazier was the Director of Cardiovascular Surgery Research at the Texas Heart Institute ("THI") at St. Luke's Episcopal Hospital (now, Baylor St. Luke's Medical Center).

In May 2018, as part of a series on the heart transplant program at THI, ProPublica and the Houston Chronicle jointly published a lengthy article on their websites. And a print version of the article appeared in the Houston Chronicle.

The print version of the article began: "Things . . . I just couldn't imagine," followed by the title: "Pioneering Heart Surgeon's Secret History of Research Violations, Conflicts of Interest and Poor Outcomes."  The online versions contained only the title.  After prominently displaying Dr. Frazier's photograph, the article opens:

> Over decades, Bud Frazier has played a leading role in the development of mechanical heart pumps and an artificial heart.  Out of public view, he's been accused of putting his quest to make history ahead of the needs of some patients.

> There's a story Bud Frazier tells often.  It was around 1966, and Frazier, now one of the world's most celebrated heart surgeons, was a medical student at Baylor College of Medicine.

> An Italian teenager had come to Houston for an aortic valve replacement, but at some point during the surgery, the teen's heart stopped.  Doctors told Frazier to reach in and start pumping the failed organ by hand.

> As he did so, the teen lifted a hand to Frazier's face, and in that moment, just before the patient died, he says he realized his life's calling.

> "As long as I was massaging that kid's heart, he would wake up," Frazier, now 78, said last year.  "I thought then, and I've often returned to this: If my hand can keep this kid alive, why couldn't we make a device to do the same?"

> In the five decades since, Dr. O.H. "Bud" Frazier has obsessively pursued that goal, contributing to many breakthroughs in the long and unfinished effort to develop a permanent mechanical replacement for the human heart.  Today, devices he tested at Baylor St. Luke's Medical Center and its research partner, the Texas Heart Institute, are credited with extending the lives of thousands of people worldwide each year.

> But out of public view, Frazier has been accused of violating federal research rules and skirting ethical guidelines, putting his quest to make medical history ahead of the needs of some patients, an

investigation by ProPublica and the Houston Chronicle has found. Reporters reviewed internal hospital reports, federal court filings, financial disclosures and government documents.

The article then outlines four key points it intends to present from its examination of these records and interviews with former St. Luke's physicians:

- Frazier and his team implanted experimental heart pumps in patients who did not meet medical criteria to be included in clinical trials, according to a hospital investigation a decade ago. The findings, which have never been disclosed publicly, prompted St. Luke's to report serious research violations to the federal government and repay millions of dollars to Medicare.

- A former top St. Luke's cardiologist said he believes that Frazier favored experimental heart pumps over more proven treatments and that Frazier was reluctant to acknowledge when the devices led to serious complications. Two other doctors made similar observations. In one instance, one of them said Frazier discouraged publication of research that found a high rate of strokes in the first group of patients implanted with a pump he championed.

- Frazier has often failed to publicly disclose consulting fees and research grants—and in one case, stock options he received and later transferred to his son—from companies that made the pumps he tested. Most medical journals require such disclosure so that other scientists and the public can judge whether personal interests may have influenced research findings.

- And a former St. Luke's nurse alleged that Frazier allowed a researcher who was not licensed to practice medicine in Texas to treat heart failure patients in his program. Her 1994 lawsuit, which was backed by patient records, testimony and secret recordings of hospital employees, revealed that Frazier's signature stamp was sometimes used to authorize the researcher's improper medical orders.

The article presents commentary from Dr. Frazier based on his interview with the journalists and subsequent written responses.

The article notes that St. Luke's officials hailed Dr. Frazier as a "great surgeon and a pioneer." And it presents commentary from Dr. Frazier's supporters—who noted that he followed the example of the pioneering cardiac surgeons under whom he trained. And, like his mentors, Dr. Frazier was "willing to try promising but unproven medical devices to help desperate patients"—and "[i]f he broke rules, . . . it was to give dying people a shot at survival, a mission that consumed his life."

The article then discusses the opinions of Dr. Frank Smart, THI's "top transplant cardiologist between 2003 and 2006," who stated that he "admired Frazier's commitment to developing lifesaving heart pumps, but he believed it led him to surgically implant the devices into some patients who were not yet sick enough to justify what was, at the time, an experimental treatment."

The article shifts focus to a lawsuit filed in 1994 in a United States District Court in Houston by former St. Luke's nurse Joyce Riley. Riley "alleged" that the hospital had "fraudulently billed Medicare for unnecessary medical treatments." The "lawsuit alleged" that an "unlicensed physician had been illegally treat[ing] heart failure patients"; that the hospital and Dr. Frazier had "participated in a scheme to unnecessarily admit patients in order to move them higher on the national heart transplant waiting list"; and that Dr. Frazier "knew of, directed, and personally participated in the fraudulent conduct and false claims described."

The article then returns to Dr. Smart, who is quoted as saying that he witnessed things "that I just couldn't imagine"—the apparent source of the title of the article (print version). Dr. Smart "believed that the program, under Frazier's guidance, was putting LVAD research ahead of what was best for patients." Smart "recalled a troubling pattern":

> A patient would come to St. Luke's with symptoms of heart failure. Smart or another cardiologist would make recommendations for treatment, such as prescribing drugs used to improve heart function, a common first step in attempting to control the disease and delay the need for a transplant. But soon after, before that initial therapy had time to work, the patient would be told he or she had days or weeks to live and then whisked off for an LVAD.

The article discusses 2005 data that it attributes to St. Luke's: "more than half of the 34 patients who received heart assist devices at St. Luke's died without leaving the hospital," which it noted was slightly higher than the national average. A series of statements and beliefs by Smart follow.

The article then presents Dr. Frazier's side, stating that he denied implanting LVADs in patients who did not require them and that all patients were evaluated extensively to assess the risks and benefits of the procedure "and were presented to a multi-disciplinary review board and had to be approved before they could be electively implanted." He said that patients who needed transplants received them when suitable donor hearts became available. "If the patients could [be] treated medically the cardiologist would never refer them to our service."

The article discusses in a positive light the FDA's approval of the "HeartMate II" LVAD for use as a permanent treatment.

The article then presents findings detailed in a 2008 special report to members of the St. Luke's board of directors ("Board Summary"). The executives concluded that Dr. Frazier and his team had implanted experimental implant devices in 30 patients who were enrolled in government health plans and for whom the medical need for the devices and compliance with trial parameters "could not be documented." St. Luke's and THI officials reported ("Self-Reporting Letter") the violations to the federal government, pledged a host of reforms, and "planned to give back between $3.4 million and $5.4 million in payments that Medicare had made on behalf of patients who received unjustified surgical treatments."

This discussion is followed by commentary from Dr. Frazier, who denied that patients had received LVADs without medical justification. His attorney, David Berg, said that the hospital based its findings on a "deeply flawed" two-day review by a health-care consulting firm known as the Anson Group. Berg said the Anson Group, which did not interview Frazier, inappropriately faulted him and his team for implanting LVADs in mortally ill patients who qualified for humanitarian exemptions to the research protocols.

The article also recites that other THI cardiologists were "concerned" about troubling side effects they had observed in some patients who had received the

LVAD device. Namely, "[a]bout a quarter of the first 71 patients implanted with the LVAD at St. Luke's had suffered strokes." There was disagreement amongst the doctors as to whether the findings should be reported. THI heart surgeon Dr. Billy Cohn stated that, in hindsight, the team "probably should have" published the stroke findings along with their solution. Commentary by Dr. Frazier then follows.

The article again shifts focus, turning to discussion that Dr. Frazier had failed to fully disclose potential conflicts of interest. It states that a 2008 report to the St. Luke's board noted Dr. Frazier's "failure to accurately complete the conflict of interest form." In addition, Dr. Frazier served as the chairman of the medical advisory board for HeartWare International and had been awarded certain stock options, according to SEC filings.

Frazier said that he held the stock options until the next year, when he transferred them to his son. And Frazier's attorney presented financial documents showing that the son exercised the options and collected proceeds totaling $130,813. But, "Frazier disclosed no conflicts." The article quotes Dr. Frazier as stating: "It never occurred to me that [my son's] having owned and sold the options was a conflict." The article also mentions that, after reporters raised questions about Dr. Frazier's omissions in two studies, a spokesperson for the New England Journal of Medicine ("NEJM") stated that Dr. Frazier had agreed to submit revised disclosure forms.

Next, the article continues with a discussion of Dr. Frazier's work. It notes that Dr. Frazier, who turned 70 in 2010, had continued to operate on patients and that his "LVAD outcomes lagged far behind those of his peers, Medicare data shows." Namely, "[f]rom 2010–15, Frazier implanted long-lasting [LVADs] in 63 Medicare patients," and "[s]ome 31 of those patients—nearly half—did not survive a year, one of the highest mortality rates in the nation." And, "[t]hat was nearly double the 25 percent one-year mortality rate for Medicare patients who received LVADs from other St. Luke's surgeons during the same period; the national rate for Medicare was 28 percent."

Finally, the article closes with an extensive discussion from Dr. Frazier about his work, presenting his side of the issues raised in the article.

The online versions of the article contained links to many of its authors' sources, including:

(1)    The Board Summary,
(2)    The Self-Reporting Letter,
(3)    The Lawsuit,
(4)    Statements by Frazier's Former Colleagues,
(5)    Evidence Regarding Failure to Disclose Conflicts, and
(6)    Medicare Data Regarding Dr. Frazier's High Mortality Rate.

Simultaneously with the article's publication, a companion report was published explaining the methodology used in analyzing the Medicare outcomes discussed in the article.

On July 9, 2018, Dr. Frazier sued the Publishers for defamation,[2] pointing to "four specific accusations":

- "Dr. Frazier inhumanely experimented on patients and violated the law."

- "Dr. Frazier hid the harmful effects of the LVAD."

- "Dr. Frazier was bought off and let money influence his medical decisions."

- "Dr. Frazier allowed a researcher, who was an unlicensed doctor, to treat patients."

Dr. Frazier alleged that the Publishers' "statements and publications as a whole and each of their statements explicitly and through their implications and impressions are false and defamatory."

He further alleged that the article "failed to 'risk-adjust' raw Medicare mortality data for the health risks of [his] mortally ill patients"; "St. Luke's decision to reimburse Medicare was based on the deeply flawed [Board] Summary"; and the article "omitted material facts to create a false impression that Dr. Frazier could be 'bought off' and valued money and medical history over saving lives."

Dr. Frazier also alleged that the article "relied on unreliable sources" and "omitted material facts that are fatal to their conclusions drawn from the [Board] Summary, the Anson Report, and Dr. Smart's accusations of research violations

---

[2]     On September 10, 2020, Dr. Frazier non-suited his claim for intentional infliction of emotional distress against all defendants.

regarding the LVAD." He additionally asserted that the Publishers' conduct constituted defamation per se.

The Publishers filed a motion to dismiss the suit under the TCPA. They alleged that Dr. Frazier could not meet his prima facie burden to establish material falsity or the requisite degree of fault, i.e., actual malice. They also asserted (1) the defense of substantial truth; (2) fair report and fair comment privileges; and (3) that certain statements constituted non-actionable or protected opinions.

During a discovery hearing, the Publishers stated on the record:

> Defendants stipulate that for the purposes of the anti-SLAPP motion, and the appeal of the anti-SLAPP motion, that plaintiffs do not have to establish clear and specific evidence of actual malice, because defendants are waiving the actual malice argument for this proceeding.

The trial court subsequently set a hearing on the Publishers' TCPA motion to dismiss. Before the hearing, the Publishers moved to strike several of Dr. Frazier's exhibits, including a report by Dr. Frazier's expert, Shannon LaBove. The Publishers argued that LaBove was asked "to evaluate whether an ordinary reader would believe the false impressions of Dr. Frazier created by the May 2018 article." And LaBove's report was based, in part, on a survey of 12 people who "purport[ed] to interpret the meaning of the article." They argued that LaBove's report constituted improper evidence because it purported to determine what a "hypothetical, objectively reasonable reader" would believe based on the article,

when such a determination is "a quintessentially judicial test." The trial court denied the Publishers' motion to strike the LaBove report, stating that "I will give it the weight it deserves."

After the hearing, the trial court denied the Publishers' TCPA motion to dismiss. In its findings of fact and conclusions of law, the trial court found that Dr. Frazier met his burden to show clear and specific evidence to establish a prima facie claim for defamation. It concluded that the Publishers "cannot raise the 'substantial truth' defense at this stage of the proceedings as a matter of law."

In the first appeal to our Court, we held that the trial court erred by not considering the Publishers' defenses. We reversed the trial court's order denying the Publishers' motion to dismiss and remanded for further proceedings. We noted that the trial court could "revisit its evidentiary rulings on remand should it decide to do so."

Subsequently, and without conducting further proceedings, the trial court again denied the Publishers' TCPA motion to dismiss.[3] The trial court found that the article created five false impressions: (1) and (2) that Dr. Frazier had federal research and ethical violations, (3) that he hid research showing an increased rate

---

[3] Because the trial court did not hold a hearing after remand and the Publishers filed their notices of appeal within twenty days after the trial court signed a written order denying the TCPA motion, this court's jurisdiction over the instant interlocutory appeal was invoked. *See KHOU-TV, Inc. v. Status Lounge Inc.*, 639 S.W.3d 752, 757 (Tex. App.—Houston [14th Dist.] 2021, no pet.).

of stroke in LVAD patients, (4) that he had conflicts of interest, and (5) that he was "an old and incompetent surgeon who should not have been operating in his seventies." The trial court concluded that Dr. Frazier met his burden to show clear and specific evidence to establish a prima facie claim for defamation and that the Publishers did not meet their burden to establish any of their defenses. This second appeal ensued.

## TCPA Motion to Dismiss

In their sole issue, the Publishers contend that the trial court erred in denying their TCPA motion to dismiss because (1) Dr. Frazier failed to meet his burden to establish a prima facie case of defamation, (2) they established their defenses, and (3) the LaBove report that the trial court relied on is legally irrelevant and not reliable. Because the Publishers' second argument is dispositive, we address it first.

### *Standard of Review*

The purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, [to] protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE § 27.002. It "protects citizens . . . from retaliatory lawsuits that seek to intimidate or silence them" from

exercising their First Amendment freedoms and provides a procedure for the expedited dismissal of such suits. *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015). The TCPA is intended to identify and summarily dispose of lawsuits "designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *Id.* at 589. It is to be "construed liberally to effectuate its purpose and intent fully." TEX. CIV. PRAC. & REM. CODE § 27.011(b).

A defendant who believes that a lawsuit is based on his valid exercise of First Amendment rights may move for expedited dismissal of the suit. *Lipsky*, 460 S.W.3d at 586. The defendant must first show by a preponderance of the evidence that the TCPA applies, that is, that the plaintiff's legal action is based on, relates to, or is in response to the defendant's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association. *Id.* at 586–87; *see* TEX. CIV. PRAC. & REM. CODE § 27.005(b).

Once the initial showing is made, the burden shifts to the plaintiff to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE § 27.005(c).

"Requiring 'clear and specific evidence' means that the plaintiff 'must provide enough detail to show the factual basis for its claim' and must provide enough evidence 'to support a rational inference that the allegation of fact is true.'" *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019) (quoting

*Lipsky*, 460 S.W.3d at 590–91). "The plaintiff may rely on circumstantial evidence—indirect evidence that creates an inference to establish a central fact— unless 'the connection between the fact and the inference is too weak to be of help in deciding the case.'" *Id.* (quoting *Lipsky*, 460 S.W.3d at 589). If the plaintiff does not meet his burden, the trial court must dismiss the plaintiff's claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005.

However, "even if the plaintiff satisfies the second step, the court will [still] dismiss the action if the defendant 'establishes by a preponderance of the evidence each essential element of a valid defense' to the plaintiff's claim." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017); *see* TEX. CIV. PRAC. & REM. CODE § 27.005(d) ("Notwithstanding the provisions of Subsection (c), the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim.")

In deciding whether dismissal is warranted, we must consider the "pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a); *see Lipsky*, 460 S.W.3d at 589 ("[T]he Act endorses a summary process, requiring judicial review of the pleadings and limited evidence"). We review de novo the trial court's determinations under section 27.005. *See Hall*, 579 S.W.3d at 377.

*Defamation*

The essential elements of a defamation claim are (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) made with the requisite degree of fault, and (4) caused damages, in some cases. *Lipsky*, 460 S.W.3d at 593.

"Establishing the falsity of an allegedly defamatory article is not as simple as showing that the article contains a statement that falls short of literal truth." *Polk Cnty. Publ'g Co. v. Coleman*, 685 S.W.3d 71, 76 (Tex. 2024). "A statement need not be perfectly true; as long as it is substantially true, it is not false." *Id.* (quoting *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 715 (Tex. 2016)). Substantial truth may be measured by whether the report "taken as a whole is more damaging to the plaintiff's reputation than a truthful [report] would have been." *Toledo*, 492 S.W.3d at 714; *see Coleman*, 685 S.W.3d at 80. "This requires determining the import of the [report] as a whole—its gist to the ordinary listener—and comparing it to a truthful report." *Toledo*, 492. S.W.3d at 714.

"Assessing substantial truth requires more than merely asking whether one statement plucked from a lengthy article is true or false." *Coleman*, 685 S.W.3d at 76. "Instead, 'the meaning of a publication . . . depends on a reasonable person's perception of [its] entirety . . . and not merely on individual statements.'" *Id.* (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). An

article is substantially true if its "gist"[4] is correct, even if it errs in the details. *Id.* That is, a news article "with specific statements that err in the details but that correctly convey the gist of a [true] story is substantially true and therefore not actionable." *Id.* (internal quotations omitted).

"Identifying the gist of an allegedly defamatory publication is a question of law for the court." *Id.* "Courts determine an article's gist or meaning by examining how a person of ordinary intelligence would view it." *Id.* (internal quotations omitted). This is an objective inquiry that asks how a "'hypothetical reasonable reader' would understand the article, not how any particular reader actually understood it." *Id.* (quoting *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004)).

With respect to the second element above, whether words are capable of the defamatory meaning the plaintiff attributes to them is also a question of law for the court. *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 356 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Libel is written defamation that "tends to injure a . . . person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury" or to "impeach" the person's "honesty, integrity, virtue or reputation." TEX. CIV. PRAC.

---

[4] "Gist" refers to a publication's "main theme, central idea, thesis, or essence." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 629 (Tex. 2018).

& REM. CODE § 73.001. A communication that hurts the plaintiff's feelings or is merely unflattering, abusive, annoying, or embarrassing is not actionable. *John Moore Servs., Inc.*, 441 S.W.3d at 356.

With respect to the third element, the status of the person allegedly defamed determines the requisite degree of fault. *Lipsky*, 460 S.W.3d at 593. Here, Dr. Frazier asserts, and the Publishers do not dispute, that he is "a renowned heart surgeon and public figure." A public figure must prove actual malice. *Id*. "Actual malice" in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Huckabee v. Time Warner Ent. Co.*, 19 S.W.3d 413, 420 (Tex. 2000).

Finally, the plaintiff must establish damages, unless the statements at issue are defamatory per se. *Lipsky*, 460 S.W.3d at 593. Defamation per se refers to statements that are so obviously harmful that general damages are presumed. *Id*. Generally, "a statement is defamatory per se if it injures a person in [his] office, profession, or occupation." *Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex. 2017) (internal quotations omitted). Whether a statement constitutes defamation per se is generally a question of law. *Lipsky*, 460 S.W.3d at 596.

### Dr. Frazier's TCPA Burden

Here, the parties do not dispute that the TCPA applies to the claim asserted. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). Thus, the burden shifted to Dr.

Frazier to establish by clear and convincing evidence a prima facie case for each essential element of his defamation claim. *See id.* § 27.005(c).

Even were we to conclude that the trial court properly considered all of Dr. Frazier's evidence—including the LaBove report—and that Dr. Frazier established the prima facie elements of his defamation claim, the trial court would still be required to dismiss his claim if the Publishers proved by a preponderance of the evidence the essential elements of a valid defense. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(d) ("*Notwithstanding the provisions of Subsection (c)*," i.e., the plaintiff's burden to establish the prima facie elements of his claim, "the [trial] court *shall dismiss* a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." (emphasis added)); *ExxonMobil*, 512 S.W.3d at 899 ("[E]ven if the plaintiff satisfies the second step, the court will [still] dismiss the action if the defendant establishes by a preponderance of the evidence each essential element of a valid defense to the plaintiff's claim." (internal quotations omitted)).

Because we conclude below that the Publishers established a valid defense to Dr. Frazier's defamation claim, we need not determine whether Dr. Frazier established a prima facie case—that is, achieved a lower burden—for each element of that claim. *See Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018)

("Assuming without deciding that [plaintiff] met his burden, we nevertheless hold that [defendant] is entitled to dismissal because he established [a valid defense]."); *Choctaw Constr. Servs. LLC v. Rail-Life R.R. Servs., LLC*, 617 S.W.3d 143, 151 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[a]ssuming without deciding" that TCPA plaintiff met its burden and determining whether defendant established valid defense).

### *The Publishers' TCPA Burden*

In their TCPA motion to dismiss, the Publishers asserted the defenses of (1) substantial truth, (2) non-actionable opinion, and (3) the fair reporting and fair comment privileges.

#### A.     Substantial Truth defense

As pertinent here, the trial court found that the article created "false impressions" that Dr. Frazier (1) committed federal research violations, (2) committed ethical violations, (3) failed to disclose conflicts of interest, and (4) was "an old and incompetent surgeon who should not have been operating in his seventies."

"Implicit defamatory meanings—like explicit defamatory statements—are not actionable if they are either true or substantially true." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 640 (Tex. 2018).

"The truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX. CIV. PRAC. & REM. CODE § 73.005(a). "In an action brought against a newspaper or other periodical or broadcaster, the defense described by Subsection (a) applies to an accurate reporting of allegations made by a third party regarding a matter of public concern." *Id.* § 73.005(b).

In determining whether the Publishers met their burden to establish substantial truth, we apply the same substantial truth test discussed above with respect to Dr. Frazier's prima facie case. *See Coleman*, 685 S.W.3d at 76; *see also Vice v. Kasprzak*, 318 S.W.3d 1, 17 n.9 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("The test is the same whether the burden of proving falsity rests on the plaintiff or on the defendant proving the . . . defense of substantial truth.").

That is, substantial truth may be measured by whether the article, taken as a whole, is more damaging to Dr. Frazier's reputation than a truthful report would have been. *See Toledo*, 492 S.W.3d at 714; *Baumgart v. Archer*, 581 S.W.3d 819, 827–28 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *see also Cox Media Grp., LLC v. Joselevitz*, 524 S.W.3d 850, 861 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "In making this determination, we do not compare the gist of the article to the actual facts; instead, we must determine whether the article is a 'fair, true, and impartial account of the proceedings' reported." *Baumgart*, 581 S.W.3d at 827–28 (quoting *Toledo*, 492 S.W.3d at 715); *Joselevitz*, 524 S.W.3d at 861; *see*

*also Hall*, 579 S.W.3d at 380 (citing TEX. CIV. PRAC. & REM. CODE § 73.005(b)) ("[M]edia outlets that accurately report allegations made by a third party about matters of public concern can assert the truth as a defense.").[5]

1.    *Federal research violations*

The Publishers argue that the trial court erred in finding that the article created a false impression that Dr. Frazier had federal research violations because the gist of the article is substantially true.

The article presents findings detailed in a 2008 Board Summary to the members of St. Luke's board of directors.  The article states that executives concluded that Dr. Frazier and his team had implanted experimental implant devices in 30 patients who were enrolled in government health plans and for whom the medical need for the devices and compliance with trial parameters "could not be documented."  St. Luke's and THI officials reported the violations to the federal government, pledged a host of reforms, and "planned to give back between $3.4 million and $5.4 million in payments that Medicare had made on behalf of patients who received unjustified surgical treatments."  The article cites, and the online versions link to, the Board Summary and Self-Reporting Letter.

---

[5]    As noted in our opinion in the first appeal in this case, Dr. Frazier did not preserve his complaints regarding the constitutionality of section 27.005(d). *ProPublica, Inc. v. Frazier*, No. 01-19-00009-CV, 2020 WL 370563, at *10 (Tex. App.— Houston [1st Dist.] Jan. 23, 2020, pet. denied) ("[T]he trial court never ruled on the constitutionality of the TCPA in connection with the Motion to Dismiss.").

The gist of the article is that Dr. Frazier *has been accused of* violating federal research rules. *See Joselevitz*, 524 S.W.3d at 861 n.13.

In support of their motion to dismiss, the Publishers presented copies of the Board Summary and Self-Reporting Letter.

The Board Summary states:

> Through our corporate compliance program, St. Luke's has identified Instances of ongoing research noncompliance in connection with the (HeartMate II LVAD Pivotal Study/Clinical Evaluation of the Jarvik 2000 Heart Assist System) protocol.
>
> . . . .
>
> In total, we identified 30 patients with government healthcare program claims associated with the LVAD studies for which medical necessity and compliance with the approved protocol could not be documented by the patient's medical record. These patients were enrolled in the studies in violation of the entry criteria without justification for the protocol deviation.

The Board Summary also reflects that Epstein Becker & Green PC reviewed LVAD research studies and produced recommendations, observations, and findings. The review included:

- Heartmate II (Thoratec) and Jarvik 2000;
- Compliance issues and deviations from protocols; and
- Reimbursement from federal programs for patients who did not qualify for the protocol.

The Board Summary states that the review "revealed serious and repeated non-compliance with FDA regulations including implantation of LVAD's in violation of study criteria and without IRB [institutional review board] approval."

"Medicare regulations state that devices must be medically necessary in order to receive reimbursement and must be used in accordance with protocols."  And, "[t]his improper use placed St. Luke's at risk for $5.4 million."

The Board Summary identifies "categories of possible risk" including: "No reasons documented for medical necessity; therefore, St. Luke's would be required to repay approximately $3.4 million (involving 17 patients)."

The Board Summary also includes the "Young Report," stating as follows:

> James Young, MD (a cardiologist with previous links to Baylor College of Medicine and The Methodist Hospital), a Cleveland Clinic physician, conducted an assessment of St. Luke's heart failure program. He described it as an aggressive program that pushes the limits.  Dr. Young found the documentation to be poor and noted that Dr. Frazier was not up front.

The Self-Reporting Letter reflects that St. Luke's and THI conducted a review of records associated with the HeartMate II Pivotal Study and the Clinical Evaluation of the Jarvik 2000.  The review "identified several instances in which subjects were enrolled without the necessary prior approval of the IRB" and "identified instances of ongoing research noncompliance occurring over a period of years."  The review states that THI will use an independent third party to conduct an audit of all "current studies in which [Dr. Frazier] is the principal investigator and report any unapproved protocol deviations and previously unreported adverse events to the IRB."

Comparing the article to the record shows that the article substantially mirrors the Board Summary and Self-Reporting Letter. *See id.* at 862.

Yet, the trial court found that the Publishers created a false impression that Dr. Frazier has research violations because they *omitted* from the article "facts about the FDA 2006 and 2009 audits"; *omitted* discussion of the FDA Clinical Study Approval Protocols; "published false statements" by Dr. Young in the Board Summary; and "misleadingly relied on reports authored by a law firm [Board Summary] and a consulting group [Anson Report]."

"A plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Baumgart*, 581 S.W.3d at 828 (quoting *Turner*, 38 S.W.3d at 115); *see Tatum*, 554 S.W.3d at 627 (in cases of defamation by implication, defamatory meaning arises implicitly from statement's text). So even if a publication "gets the details right but fails to put them in the proper context and thereby gets the story's 'gist' wrong," it may be liable for defamation. *Turner*, 38 S.W.3d at 115 (internal citation omitted).

Dr. Frazier's evidence includes an FDA "Establishment Inspection Report" from June 2009, which references an August 2006 inspection. The article does not

mention the FDA—other than to note, in a positive light, its approval of the HeartMate II device.

However, the substantial truth of the statements in the article is not measured by the accuracy of the underlying facts, i.e., whether the Board Summary or Anson Report are actually correct in light of isolated FDA reports or protocols, or whether the Board Summary accurately reflects Dr. Young's reviews. *See Baumgart*, 581 S.W.3d at 827–28. Rather, any liability of the Publishers focuses on whether the article is a "fair, true, and impartial *account* of the proceedings reported." *See id.* (emphasis added).

The trial court also found that the Publishers created a false impression that Dr. Frazier had research violations by "misleadingly juxtapos[ing] statements." Specifically, it found that the Publishers placed a quote by Dr. Smart— "Things. . . I just could not imagine."—in the article headline, followed by: "A Pioneering Heart Surgeon's Secret History of Research Violations, Conflicts of Interest, and Poor Outcomes." It found that such "gives the false and misleading impression that the quote is about Dr. Frazier—that the accusation of his 'hidden history' is true."

Dr. Frazier's evidence includes a transcript of Hixenbaugh's telephonic interview with Dr. Smart. In the interview, Dr. Smart recounted his experiences in the St. Luke's LVAD program. The statement at issue, "Things. . .I just could not

imagine," occurs within the context of Dr. Smart's discussion of the program, which he notes was under Dr. Frazier's guidance.

We conclude that the allegedly defamatory statements, when compared against the record, are substantially true because they are not more damaging to Dr. Frazier's reputation than truthful statements would have been. *See Tatum*, 554 S.W.3d at 640–41; *Toledo*, 492 S.W.3d at 714–15; *Baumgart*, 581 S.W.3d at 827–29. Thus, the gist of the article, that Frazier *has been accused of* violating federal research rules, is substantially true. *See Coleman*, 685 S.W.3d at 76; *Baumgart*, 581 S.W.3d at 827–28; *see also Joselevitz*, 524 S.W.3d at 861–62.

### 2. *Ethical violations*

The trial court also found that the Publishers created a false impression that Dr. Frazier has ethical violations because they "misleadingly reported" the 1994 lawsuit. Specifically, the Publishers "made the following false statement: 'Frazier allowed a researcher who was not licensed ["Dr. Brano"] to practice medicine in Texas to treat heart failure patients in his program.'"

The Publishers argue that the gist of the article is substantially true because it accurately describes the allegations in the Riley lawsuit.

The article states that, in a "1994 federal lawsuit," former St. Lukes nurse Joyce Riley alleged that Dr. Frazier had "'participated in a scheme' to unnecessarily admit patients in order to move them higher on the national heart

transplant waiting list." According to the article, filings in the lawsuit state that a researcher who was not licensed to practice medicine in Texas had "routinely issued orders for patients in Frazier's program, prescribed drugs, took resident medical students on rounds, helped harvest organs for transplant and provided post-surgical patient care." And the 1994 lawsuit, "backed by patient records, testimony, [and] secret recordings of hospital employees, revealed that Frazier's signature stamp was sometimes used to authorize the researcher's improper medical orders." The lawsuit alleged that Dr. Frazier "knew of, directed, and personally participated in the fraudulent conduct and false claims described therein."

Thus, the gist of the article is that Dr. Frazier *has been accused of* skirting ethical guidelines. *See Joselevitz*, 524 S.W.3d at 861 n.13. The essence of the allegation is that he knowingly allowed his signature to be used on the orders of an unlicensed physician.

In support of their motion to dismiss, the Publishers presented a copy of the Third Amended Complaint filed in *United States, ex rel Joyce Riley v. St. Luke 's Episcopal Hospital*, Cause No. H-94-3996, in the United States District Court for the Southern District of Texas. The complaint reflects that Riley alleged:

> 4.     [A]n ongoing conspiracy among all the Defendants allows a man who was not licensed to practice medicine in the United States to harvest organs and treat transplant patients. St. Luke's Episcopal Hospital, its doctors and nurses, as well as the University of Texas Health Science Center, Baylor

College of Medicine, Surgical Associates of Texas, P.A., and the Texas Heart Institute, all knew Branislav Radovancevic had no license. Yet "Dr. Brano," as he was nicknamed, cared for patients on the transplant floor. Issued orders. Prescribed drugs. Took doctors on rounds. Upgraded patients' status. Harvested organs here in Houston and around the country. And decided who would receive a transplant.

5.    The physician and nursing staff were told to follow his orders—but not to sign his name to any documentation. Other doctors signed for him. Ostensibly, Defendant Dr. O. Howard Frazier, a licensed doctor, was supposed to care for these patients. He was the doctor who billed these patients. But many never saw him.

A comparison of the article to the record shows that the article accurately presents the *allegations* in the petition. *See Joselevitz*, 524 S.W.3d at 862. And the article postures these allegations as such, i.e., "allegations." That these are the allegations in the lawsuit is literally true. *See Tatum*, 554 S.W.3d at 640; *see also* TEX. CIV. PRAC. & REM. CODE § 73.005(b).

Dr. Frazier presented his affidavit stating that the hospital was responsible for credentialing physicians and that he bore no responsibility for verifying the credentials or licensure. He stated that "any implication or expression" that he "allowed or encouraged an unlicensed doctor to practice medicine is false."

Again, we do not compare the gist of the article to the *actual* facts; instead, we have determined simply that the article is a "fair, true, and impartial account of the proceedings reported." *See Baumgart*, 581 S.W.3d at 827–28.

Further, with respect to skirting ethical guidelines, we conclude that the allegedly defamatory statements, when compared against the record, are not more

damaging to Dr. Frazier's reputation than a truthful statement would have been. *See Tatum*, 554 S.W.3d at 640–41; *Toledo*, 492 S.W.3d at 714–15; *Baumgart*, 581 S.W.3d at 827–29. Thus, they are substantially true. *See Coleman*, 685 S.W.3d at 76; *Baumgart*, 581 S.W.3d at 827–28; *see also Joselevitz*, 524 S.W.3d at 861–62.

### 3.    *Failing to disclose conflicts of interest*

The Publishers argue that the trial court erred in finding that the article created the "false impression . . . that Dr. Frazier had conflicts of interest that impacted the accuracy of the research" because the gist of the article is substantially true.

The article states that Dr. Frazier has had, by his own accounting, a hand in developing nearly every cardiac pump in use today. Yet, he had "often" failed to fully disclose potential conflicts of interest dating back to 2008. It states that a 2008 St. Luke's Board Summary noted his "failure to accurately complete the conflict of interest form" and that he "still doesn't understand." In support of their motion to dismiss, the Publishers presented the Board Summary.

According to the article, from 2013 to 2016, federal data showed that device makers paid Dr. Frazier $44,000 for travel, meals, and work on their behalf. But Dr. Frazier did not disclose those payments in related research papers. The article cites, and the online versions link to, two studies and a letter that editors at NEJM sent to Dr. Frazier. A spokesperson told reporters that Dr. Frazier agreed to submit

revised disclosure forms. In support of their motion to dismiss, the Publishers presented the NEJM correction.

The article also states that, in 2008, Dr. Frazier served as the chairman of the medical advisory board for HeartWare International and, according to SEC documents, which were linked in the online version of the article, he was awarded certain stock options. One year later, Frazier transferred them to his son. And Frazier's attorney presented documents showing that the son had exercised the options and collected proceeds totaling $130,813. The article quotes Dr. Frazier as stating: "It never occurred to me that [my son's] having owned and sold the options was a conflict."

The gist of the article is that Dr. Frazier failed to comply with standards for disclosure and conflicts of interest. *See Joselevitz*, 524 S.W.3d at 861 n.13. Dr. Frazier complains that the article "omitted material facts to create a false impression that [he] could be 'bought off' and valued money and medical history over saving lives." And it "misleadingly juxtapose[d]" facts to make it appear that he "often" failed to comply with industry standards regarding reporting conflicts. However, a comparison of the article to the record before us shows that the article substantially mirrors the Board Summary and NEJM correction. *See id.* at 862.

Further, in his affidavit, Dr. Frazier does not dispute that he received $44,000 as stated in the article and that he received payments over a "several-year

period." He does not address disclosure but simply asserts that such payments "would not have caused [him] to have any conflicts of interest." In his response to the motion to dismiss, he admits having received the stock options.

Accordingly, we conclude that the allegedly defamatory statements, when compared against the record, are not more damaging to Dr. Frazier's reputation than a truthful statement would have been. *See Tatum*, 554 S.W.3d at 640–41; *Toledo*, 492 S.W.3d at 714–15; *Baumgart*, 581 S.W.3d at 827–29. Thus, they are substantially true. *See Coleman*, 685 S.W.3d at 76; *Baumgart*, 581 S.W.3d at 827–28; *see also Joselevitz*, 524 S.W.3d at 861–62.

4.    "*Old and incompetent surgeon*"

The Publishers argue that the trial court erred in finding that the article created the false impression that Dr. Frazier was "an old and incompetent surgeon who should not have been operating in his seventies." The trial court found that the Publishers falsely reported that, during the last five years of his career as a surgeon, Dr. Frazier had one of the highest mortality rates in the nation.

According to the article, Dr. Frazier stated that, in 2010, he turned 70 years old and "began to transition to a new role"—"continuing to direct research" at THI while "allowing younger physicians to take the lead on most transplants and pump implantations." And it was his decision to stop operating in 2015.

The article states that "Medicare data shows" that, from 2010 to 2015, Dr. Frazier "implanted long-lasting [LVADs] in 63 Medicare patients," and "[s]ome 31 of those patients—nearly half—did not survive a year." This was "nearly double the 25 percent one-year mortality rate for Medicare patients who received LVADs from other St. Luke's surgeons during the same period." In addition, it was "one of the highest mortality rates in the nation"—as the "national rate for Medicare was 28 percent." The article notes that St. Luke's "said it stood behind the accuracy of the numbers it submitted to Medicare."

In the article, Dr. Frazier responded that it was "grossly unfair" to focus solely on Medicare patients, rather than on the larger pool of patients the hospital treated. But the article explains that "[r]esearchers commonly compare outcomes using Medicare data because it represents tens of millions of patients and because data for privately insured patients is not publicly available."

The gist of the article is that Dr. Frazier had one of the highest mortality rates in the nation during the last five years of his career as a surgeon. *See Joselevitz*, 524 S.W.3d at 861 n.13.

In support of their motion to dismiss, the Publishers presented the affidavit of Hannah Fresques, a data reporter for ProPublica. In her affidavit, Fresques noted that she has a Master's Degree in Quantitative Methods for Social Science from Columbia University, where she studied research methodology, applied

statistics, and data science, and she has five years' experience as a data analyst in

policy research.  With respect to her work on the article, she stated:

10.    For our analysis, ProPublica used data from The Centers for Medicare & Medicaid Services (CMS) covering hospital in-patient visits and mortality for 2010-2015.  (Specifically, the files were the Medicare 100% Standard Analytic Files and Denominator Files.)  The data was submitted by hospitals to Medicare for billing purposes, and hospitals are responsible for its accuracy.  The data is not publicly available but instead is only available to researchers who go through an approval process and sign a data use agreement. . . .

11.    Each record in the data represents a patient's hospital visit, indicating when the patient was admitted, what diagnoses were present, which procedures were performed, and the identity of the operating surgeon, if applicable. The data conceals patients' names, Medicare ID numbers, addresses, and dates of birth. The data does not represent all patients, only those who are enrolled in fee-for-service Medicare.

12.    For the purpose of our analysis, we looked at a subset of records related to patients who underwent certain heart procedures. Specifically, we looked at claims submitted under diagnosis groups 001 and 002, which cover heart transplants mid implantation of mechanical heart pumps, and then further looked for specific procedure codes that correspond to ventricular assist device implantation (37.66 under the 1CD-9 schema and 02MA0QZ under ICD-10). In total, our analysis looked at 7,552 such in-patient visits, covering a total of 7,277 patients.  These numbers include 63 patients operated on by Frazier. . . .

13.    With 63 patients, Frazier was one of the highest-volume surgeons in the country for ventricular assist device Implantations in Medicare patients.  There were 773 surgeons who performed the operation under Medicare in that time period.  By number of LVAD patients, Frazier ranked 24th among them. St Luke's/THIs program ranked third in terms of volume of LVAD Medicare patients among the 188 hospitals where the operation was performed.

14.    We looked at mortality data for Frazier as well as surgeons at all other hospitals across the country and found that, during the time period at issue (2010–2015), about half (31 of 63) of Frazier's patients did not

survive a year, which was one of the highest mortality rates in the nation. Frazier's mortality rate was 49 percent; this was nearly double the 25 percent mortality rate for Medicare patients who received LVADs from other St. Luke's surgeons during that same time period. During that period, the national mortality rate for Medicare was 28 percent. Comparing Frazier to the 191 other surgeons in the country with ten or more LVAD procedures under Medicare during 2010-2015, Frazier had the ninth highest mortality rate, though the highest among doctors who performed as many or more surgeries than him.

The Publishers also presented a companion report, "Here's How ProPublica Analyzed Bud Frazier's Medicare Outcomes," in which it publicized its underlying methodology.

A comparison of the article to the record shows that the article tracks the Publishers' findings based on their review of CMS data covering hospital in-patient visits and mortality for 2010–2015—specifically, the Medicare 100% Standard Analytic Files and Denominator Files. *See id.* at 862.

But Dr. Frazier complains that the Publishers "failed to 'risk-adjust' raw Medicare mortality data for the health risks of [his] mortally ill patients." He argued that there are other variables for which the article simply fails to account—such as, "heart surgeons nationwide sent their hardest cases" to him. And, rather than placing his "high-risk practice in proper context," the Publishers "portrayed [him] as a doddering surgeon operating 'well into his 70s,' his diminished surgical skills proven by an abnormally high mortality rate."

In his affidavit, Dr. Frazier states that a "properly risk-adjusted ranking would not show [his] patients' outcomes so low." He did not, however, present any evidence of what properly risk-adjusted data would have shown.

We conclude that the allegedly defamatory statements, when compared against the record before us, are not more damaging to Dr. Frazier's reputation than a truthful statement would have been. *See Tatum*, 554 S.W.3d at 640–41; *Toledo*, 492 S.W.3d at 714–15; *Baumgart*, 581 S.W.3d at 827–29. They, too, are substantially true. *See Coleman*, 685 S.W.3d at 76; *Baumgart*, 581 S.W.3d at 827–28; *see also Joselevitz*, 524 S.W.3d at 861–62.

## B.    Non-actionable opinions

The Publishers argue that the trial court erred in finding that the article created the false impression that Dr. Frazier "hid research showing an increased rate of stroke in LVAD patients." They assert that the statements at issue by Drs. Cohn and Smart constitute non-actionable opinions as they are expressly stated as their "beliefs" in the article.

"[S]tatements that are not verifiable as false cannot form the basis of a defamation claim." *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794–95 (Tex. 2019). "Statements that cannot be verified, as well as statements that cannot be understood to convey a verifiable fact, are opinions." *Tatum*, 554 S.W.3d at 639. In distinguishing between a fact verifiable as false and an opinion, we

focus on the verifiability of the statement. *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). "And even when a statement *is* verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as fact." *Tatum*, 554 S.W.3d at 639. Whether a statement constitutes a non-actionable opinion is a question of law. *Id*.

The article discusses what two cardiologists at THI who were familiar with Dr. Frazier's research "said" and "believed" with respect to their concerns about the incidence of stroke in patients who had received the Heartmate II LVAD.

Drs. Cohn and Smart "observed a troubling side effect in some patients," namely, "[a]bout a quarter of *the first 71 patients* implanted with the LVAD at St. Luke's had suffered strokes." (Emphasis added.) They "told reporters that *they believed those* findings should have been published in a medical journal, but they were not." (Emphasis added.) Dr. Cohn recalled the matter as a "disagreement" with Dr. Frazier.

Additionally, Dr. Smart expressed his concerns that LVAD research was taking priority over what he believed was best for patients, and, as a result, patients were receiving experimental heart pumps before they needed them and were staying on them rather than receiving transplants.

The article throughout postured the comments by Drs. Cohn and Smart as their "beliefs" and recounted examples of why they held those beliefs. These are

reports on assertions of opinion. *See Tatum*, 554 S.W.3d at 639.  As such, they cannot form the basis of a defamation claim. *Id.*

Dr. Frazier states in his affidavit that he has published research results indicating a significant risk of stroke in LVAD patients.  He does not state, however, that these articles disclosed the incidence of stroke in the first 71 patients implanted with LVADs at St. Luke's—the concern stated by Drs. Cohn and Smart. The article does not state that Dr. Frazier has never published *any* articles on the risk of stroke.

Accordingly, we conclude that the Publishers established by a preponderance of the evidence their defenses of substantial truth and non-actionable opinion. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(d); *ExxonMobil*, 512 S.W.3d at 899.  We therefore do not reach their privilege defenses.

We sustain the Publishers' sole issue.

**Conclusion**

For all the reasons above, we hold that the Publishers are entitled to dismissal under the TCPA. We therefore reverse the trial court's order in all things and remand for dismissal and a determination of attorney's fees consistent with the TCPA. *See* TEX. CIV. PRAC. & REM. CODE § 27.009(a).


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.